599 So.2d 335 (1992)
STATE of Louisiana
v.
Anthony G. CHATMAN.
No. KA910094.
Court of Appeal of Louisiana, First Circuit.
April 10, 1992.
*337 Doug Moreau, Dist. Atty., Office of the Dist. Atty., Baton Rouge, by Stephen Pugh, Asst. Dist. Atty., for plaintiff/appellee.
Jeff Calmes, Baton Rouge, for defendant.
Before COVINGTON, C.J., and LeBLANC and WHIPPLE, JJ.
COVINGTON, Chief Judge.
Defendant, Anthony Gerald Chatman, was charged by bill of information with three counts of distribution of cocaine, violations of LSA-R.S. 40:967A(1). Following trial by jury, he was acquitted on Counts I and II and found guilty as charged on Count III. Defendant filed a motion for post verdict judgment of acquittal. In lieu of granting the motion, the trial court modified the guilty verdict and rendered a judgment of conviction on the lesser and included offense of attempted distribution of cocaine, a violation of LSA-R.S. 14:27, 40:967A(1) and 40:979A.[1] Subsequently, *338 the trial court sentenced defendant to imprisonment at hard labor for a term of three years (with credit for time served) and to pay a fine of fifteen hundred dollars and court costs.[2] Defendant has appealed, urging four assignments of error:
1. The trial court erred by denying defendant's "Batson" motion challenging the state's use of its peremptory challenges.
2. The jury's verdict was contrary to the law and the evidence.
3. The trial court erred by not granting defendant's motion for post verdict judgment of acquittal.
4. The trial court erred by imposing an excessive sentence.
In approximately June of 1988, United States Postal Inspectors Paul Krug, Jr., and Gary Johnson met with Tom Gallagher,[3] a postal employee at the main post office located on Florida Street in Baton Rouge, following Gallagher's arrest by the East Baton Rouge Parish Sheriff's Office (EBRSO) on a charge of possession with intent to distribute cocaine. The record reflects that the inspectors indicated to Gallagher that if he cooperated with them in their investigation of possible illegal drug abuse and drug dealing by other employees working at the main post office, they would make that cooperation known to the postmaster at the main post office and the district court. Gallagher agreed to cooperate;[4] at that point, a decision was made that the investigation would be a joint endeavor of the postal inspectors and local officers of the EBRSO.
Based upon information Gallagher had provided to law enforcement officers identifying a number of individuals employed at the main post office who allegedly had been dealing narcotics there, the officers formulated a plan. The plan was to use the information Gallagher had provided and have Gallagher negotiate and transact purchases of cocaine with employees at the main post office. Under the plan, Krug served as case agent, and a number of other officers, including Johnson and EBRSO officers Terry Felton and Charles P. Byrne, provided assistance to Krug in the undercover drug investigation which followed.
Krug explained that after the plan for the undercover investigation had been formulated, Gallagher made telephone calls at the EBRSO in order to contact targets of the drug investigation. All of these calls, which were tape recorded, were made at Krug's or the EBRSO's direction. Gallagher was essentially told what to say concerning drug transactions (controlled buys) he arranged, including the location where the transactions occurred, in order that the officers would have as much control as possible.
The procedures described by Krug and Johnson concerning controlled buys were basically as follows. Before each buy, *339 Gallagher and the officers met at the EBRSO. Gallagher then contacted the targeted individual by telephone. The recorded telephone conversation was played back by the officers. Gallagher and his personal vehicle were searched thoroughly by the officers to ensure that there were no drugs on Gallagher's person or in his vehicle, and any personal funds of Gallagher were removed from his possession. After he was given a specific amount of government funds to purchase narcotics and was equipped with a body transmitter, Gallagher departed the EBRSO in his vehicle. Any conversations which occurred in the presence of the transmitter were recorded and monitored by officers.[5] Gallagher was kept under continuous surveillance by officers from his departure until he effected a transaction and returned to the EBRSO, where he and his vehicle were again thoroughly searched. Upon his return to the EBRSO, Gallagher relinquished custody of any narcotics he had successfully purchased.
Krug's and Johnson's testimony reflect that through the use of the procedures described above, Gallagher was observed by surveillance officers meeting with defendant Chatman at various locations on August 17, 26, and 27, 1988, and on September 15, 1988. On each of these occasions, with the exception of September 15, Gallagher proceeded alone to the place (where he met defendant). On September 15, Gallagher was accompanied by Johnson (who served in an undercover capacity) to defendant's home.
Krug testified that in reference to the August 17 meeting,[6] a telephone call was made at the EBRSO that same date before the meeting. Gallagher was given six hundred fifty dollars to purchase narcotics. Gallagher drove from the EBRSO to the main post office where he parked in the parking lot. Krug testified that defendant was seen by him going from the post office to Gallagher's vehicle, where Gallagher and defendant met for about five minutes. Krug testified as follows. Chatman got into Gallagher's vehicle, which exited the parking lot and was followed by surveillance vehicles. When Gallagher's vehicle returned to the post office, Krug saw defendant go to another vehicle beside Gallagher's vehicle and observed what appeared to be a transaction between Chatman and people inside the other vehicle. Defendant then returned to Gallagher's vehicle and appeared to be carrying something in his hand. He was observed inside Gallagher's vehicle; about three to five minutes later, he left the vehicle and went back inside the post office. Johnson testified that upon returning to the EBRSO, Gallagher gave the authorities a plastic baggie, State Exhibit S-1, which Johnson described as containing a "white powdery substance." According to Johnson, the substance was field-tested by Pat Byrne; and the result of the test was positive for cocaine.
According to Krug and Johnson, (after the telephone call on August 17 which preceded the meeting on that same day) Gallagher made telephone calls to defendant on August 24 and 25. After these calls, he again made a telephone call on August 26 and 27 and September 15, before he met defendant on each of those dates.
Regarding the August 26 meeting, Gallagher was given one thousand two hundred twenty-five dollars for the purchase of drugs. He was placed under continuous surveillance from the time he left the EBRSO in his vehicle. Johnson followed Gallagher to a rental business where defendant's vehicle was seen pulled up beside Gallagher's vehicle. Gallagher exited his vehicle and went to Chatman's vehicle. Gallagher stayed there a short time before returning to his own vehicle. Gallagher's *340 vehicle then went to a McDonald's Restaurant on Florida Boulevard near the rental business. Gallagher stayed at the restaurant about an hour and thirty minutes until defendant came to the restaurant, where he and Gallagher met and appeared to have a conversation. About five to ten minutes after the two men met, they left the restaurant. When Gallagher was searched at the EBRSO after he returned there, he no longer had the twelve hundred twenty five dollars.[7]
Johnson testified that on the following day, August 27, Gallagher was given one thousand two hundred twenty-five dollars for the purchase of controlled dangerous substances. Johnson further testified as follows: Gallagher entered his vehicle at the EBRSO and drove to Seigen Lane where he stopped at a K-Mart. Defendant appeared at the location, pulling into the parking lot and parking near Gallagher's vehicle. According to Johnson, Chatman reached into Gallagher's vehicle. He then walked away from it, returned to his own car and left the area. Johnson continued to maintain his surveillance, which concluded with Gallagher's return to the EBRSO.
Krug testified that, upon Gallagher's return to the EBRSO, Gallagher produced a bag of what appeared to be cocaine (State Exhibit S-2). He further testified that field testing subsequently indicated that the substance was positive for cocaine.[8]
Finally, in regard to the September 15 meeting,[9] when Gallagher and Johnson went to Chatman's residence on G.S.R.I. Road, the meeting was again preceded by a telephone call which Gallagher made from the EBRSO. At the EBRSO, Gallagher and his vehicle were searched; and he and Johnson were each given twelve hundred dollars in government funds to purchase drugs. A body transmitter was placed on Gallagher's person. Johnson got into Gallagher's vehicle with Gallagher, and the two went to defendant's residence. Krug rode in a vehicle with EBRSO narcotics detectives, who parked at a convenience store away from the residence; and from that location, Krug and the detectives listened to the transmission they received via the body transmitter on Gallagher's person.
Johnson testified that when he and Gallagher arrived at defendant's residence, Chatman was outside. However, defendant, who was very friendly, went into the residence with the two men. Johnson and Gallagher each wanted to purchase an ounce of cocaine with the twelve hundred dollars they each had.
According to Johnson, when he and Gallagher entered defendant's residence, he told them that he did not (at that time) have the cocaine and that he had to "go and get it." Defendant appeared to be knowledgeable about cocaine. Indicative of that knowledge, he referred to the cocaine that the two men were going to purchase as "rock-cocaine, that it was in a solid form, that it was, you know, good stuff." He also made reference to the quality of the cocaine, "that it tasted good"; and he made comments concerning a prior transaction, which according to Johnson was the "second transaction" between Gallagher and defendant. Those comments were that the weight of the cocaine was "light, there wasn't enough weight" but that he was going to "take care of Mr. Gallagher," "make it up to him," because Gallagher was "a good customer."
While Johnson and Gallagher were at Chatman's residence, defendant left and returned to the residence three separate times before concluding the transactions with them. The first time he left, he returned *341 shortly thereafter and told the purchasers that he needed the money. Johnson was initially hesitant about giving him the twenty-four hundred dollars. However, defendant indicated that there would be no problem giving him the money "up front" because the supplier, an individual he knew, was reliable. Chatman stated: "You don't have to worry about this guy, we can trust him, he's a good guy." Johnson and Gallagher then each gave defendant twelve hundred dollars. Defendant left the residence for the second time and returned about thirty minutes later. Upon his return, he told Johnson and Gallagher that there would be no problem and that he was getting the cocaine; he also told them that the supplier was about a quarter ounce short of two ounces but that someone was going to bring the quarter ounce to the supplier.
Eventually, the supplier who was supposed to call defendant's residence (apparently when the full two ounces were secured) did call. Chatman then left the residence for the third time; and, when he returned, he had two ounces of cocaine in separate plastic bags with him. Defendant handed the two bags (State Exhibit S-3)[10] toward Gallagher and Johnson, who were on opposite sides of a table from defendant. Each purchaser picked up one of the bags. Johnson and Gallagher proceeded to weigh the bags on a triple beam scale similar to those used at the post office, which Johnson had brought with him to defendant's residence. While Johnson and Gallagher were trying to adjust the scale to assure an accurate reading, Chatman who appeared to be knowledgeable made the necessary adjustment. Johnson and Gallagher then weighed the bags and assured defendant that they were satisfied. Just before the two men left the residence, Johnson asked Chatman for something to cover the scale to conceal it when he walked outside, and defendant gave him some newspaper to cover it. Again, Chatman made reference to the quality of the cocaine as Johnson and Gallagher were getting into Gallagher's vehicle to leave the residence.
Subsequently, arrest warrants were drawn up for defendant's arrest. The state and the defense stipulated that Chatman was arrested on November 22, 1988, that he was taken into custody and advised of his rights, and that he did not make any statements.
Chatman took the stand at trial in his own defense. He testified that he and Tom Gallagher were co-workers at the main post office in Baton Rouge. They played softball on the office's softball team. At various times, defendant and Gallagher met in Baton Rouge while not at work. Chatman socialized with Gallagher's family, and Gallagher socialized with his family. He had known Gallagher for about six years, and about two years after Gallagher came to work at the post office, Chatman gained knowledge that Gallagher sold drugs.
According to defendant, Gallagher called him on the telephone frequently. Sometimes the purpose of the calls dealt with general conversation. Other times, the calls were about Chatman being able to obtain drugs for Gallagher. Gallagher always initiated the calls, and when he would call defendant concerning drugs, Chatman would tell him that he did not know anyone who had or dealt drugs. During the period from August 1 to September 15, 1988, Gallagher and Chatman talked on the telephone numerous times, more than fifteen times.
In response to defense counsel's questioning on direct examination as to whether *342 he had sold drugs to Gallagher on August 17, 1988, or "August 28th, 1988," and whether Gallagher had given defendant money on August 26, 1988, for defendant "to go all over town and try to buy drugs for him [Gallagher]" Chatman responded in the negative. On cross-examination, he testified that the officers were not telling the truth about his having sold drugs to Gallagher on August 17 and August 27. However, in reference to the September 15, 1988 meeting at his home, defendant gave the following testimony.
On September 15, Chatman was outside his home. Gallagher and the "other guy" (Johnson, who was working undercover at the time) pulled into defendant's driveway. When Gallagher exited the vehicle, Chatman recognized him. They talked, and Chatman asked both men if they wanted to come into his home. Accepting the invitation, Gallagher and Johnson went inside his home, sat and talked to him. Gallagher asked defendant if he would be able to get drugs for him that morning. Chatman answered in the negative, telling Gallagher that he "didn't know anyone at this time that I could get any drugs from, who would have these drugs for him." At this point, Gallagher and Johnson showed him the money they had to buy the drugs. Chatman testified that he, Gallagher and Johnson talked awhile; according to defendant, he told Gallagher the following: "Well, since you got the money and everything, I could go down and check with my neighbor, which I did."
Chatman testified that he was aware that the neighbor, Mike Smith, always had people in and out of his home. Although defendant testified that he had never previously bought drugs from Mike Smith, he indicated that he assumed all the activity at Smith's home was drug-related and that from listening to Smith talking on some prior occasion he "knew" Smith was dealing drugs.
Defendant testified that when he went to check with his neighbor, he told Gallagher and Johnson they could wait at his home, if they wanted to do so. According to him, when he left his home and went to his neighbor, his neighbor told him he "didn't have anything," "couldn't do anything right then," but that he would call defendant later. Chatman stated that he was going to let Gallagher and Johnson make the transaction with Smith themselves, but Smith told him that he did not know Gallagher and Johnson and did not want to meet them. Defendant testified that "if anything was going to happen, I would have to do it, they would have to do it through me." He also testified that he returned to his home after talking to Smith and told Gallagher and Johnson what Smith had said. They wanted to wait for Smith to call. When Smith called, he told Chatman that he did not have "quite the amount that they wanted." When defendant told Gallagher and Johnson that Smith did not have the two complete ounces, they replied that they wanted two ounces. He relayed the information to Smith, who was still on the telephone. Smith indicated to defendant that he probably could get the remainder of it if they would wait a little longer. They decided to wait for it. Smith called again, saying he had it. Defendant then took the money, went to Smith's residence, got the drugs from Smith and returned to his home with the drugs, which he gave to Gallagher and Johnson. Gallagher and Johnson weighed the drugs on the scale Johnson had brought with him, found the drugs satisfactory and left Chatman's residence.
Defendant testified that other than this one time, he has never bought or sold cocaine. He stated he has never used cocaine, but he admitted that he and Smith had smoked marijuana together and that he had purchased marijuana "numerous of (sic) times." However, defendant denied having ever sold marijuana.
According to Chatman, he obtained the drugs for Gallagher and Johnson on September 15 because of his concern for Gallagher's financial problems and his friendship with Gallagher. Defendant denied that he made any money through the transaction and stated that he did not keep any of the drugs. However, he admitted that later that same day while at work, he asked Gallagher for some marijuana for "what I'd did (sic) for him earlier that day." *343 Gallagher indicated he would get some marijuana for defendant. Thereafter, on November 21, 1988, the day before defendant's arrest, Gallagher compensated him with twenty dollars worth of marijuana, which defendant had in his possession at the time of his arrest.
On rebuttal, the state presented the testimony of Johnson. In regard to the September 15 transaction, Johnson testified that he did not force defendant, threaten or in any way coerce defendant and that Chatman's actions appeared to be free and voluntary.
ASSIGNMENT OF ERROR NUMBER ONE:
By means of this assignment, defendant contends that the trial court erred by denying his "Batson" motion challenging the state's use of peremptory challenges.
A peremptory challenge by the state may not be based solely upon the race of the juror. LSA-C.Cr.P. art. 795. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that an equal protection violation occurs when the prosecutor, in the trial of a member of a cognizable racial group, exercises peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. In Batson, the Supreme Court also set standards for assessing a prima facie case of purposeful discrimination and placed the burden on the prosecution, after such a prima facie showing, to come forth with a neutral explanation for challenging black jurors that related to the particular case. See State v. Collier, 553 So.2d 815, 817 (La.1989).
In Batson v. Kentucky, the United States Supreme Court held that a defendant may establish a prima facie case of discriminatory selection of the petit jury solely on evidence concerning the state's use of its peremptory challenges at the defendant's trial. In regard to the establishment of such a prima facie case, the Supreme Court stated the following:
To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280 [51 L.Ed.2d 498 (1977) ], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, 345 U.S. [559], at 562, 73 S.Ct. [891], at 892 [97 L.Ed. 1244 (1953) ]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
106 S.Ct. at 1723.
In Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), a case involving a white defendant, the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, "a practice that forecloses a significant opportunity to participate in civic life." The Supreme Court further held that, while an individual juror does not have the right to sit on a particular petit jury, the juror possesses the right not to be excluded from serving on one on account of race. The Court concluded that any defendant, regardless of his race, may raise the third-party equal protection claims of jurors excluded by the prosecution because of their race. Consequently, the holding in Powers v. Ohio alleviates the initial showing required under Batson for establishment of a prima facie case of purposeful discrimination, i.e., that the defendant was a member of a cognizable racial group and that the prosecutor had exercised peremptory challenges to remove venire members of the defendant's race. State v. Lamark, *344 584 So.2d 686, 695 n. 5 (La.App. 1st Cir.), writ denied, 586 So.2d 566 (La.1991). However, in all other respects, the defendant still must make a prima facie showing of discriminatory selection as required by Batson.
The trial judge must determine whether the defendant has established the requisite prima facie case of discriminatory selection. In making this determination, the judge should consider all relevant circumstances, including any pattern of strikes by the prosecutor against black jurors and any questions or statements by the prosecutor during voir dire examination or in exercising his challenges which may support or refute an inference of purposeful discrimination. Batson v. Kentucky, 106 S.Ct. at 1723; State v. Collier, 553 So.2d at 819.
Batson places the burden on the prosecution, after a prima facie showing of purposeful discrimination has been made, to come forward with a neutral explanation for challenging black jurors that related to the particular case. State v. Collier, 553 So.2d at 817 (La.1989). Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Batson v. Kentucky, 106 S.Ct. at 1724 n. 21.
In the instant case, after the eleventh member of the jury was selected and sworn, defense counsel entered his Batson objection. Thus the objection was timely. See State v. Lamark, 584 So.2d at 695. In making the objection, defense counsel stated that it was his understanding that the prosecutor had exercised five peremptory challenges, four of which had excused black persons, and that there seemed to be no reason for excusing them.
In response, the prosecutor stated that five of the eleven jurors already selected and sworn were black and that, if the defense had not peremptorily challenged Mr. McCullough, a black prospective juror accepted by the state, the final composition of the jury would have been half white and half black. Additionally, the prosecutor indicated that it was a coincidence that four of the five peremptory challenges he had used had excluded black individuals, that the excluded individuals had not been challenged because of their race and that he had valid reasons for every peremptory challenge he had exercised.
Before ruling on defense counsel's Batson objection, the trial court observed that, pursuant to Batson and the guidelines articulated by the Louisiana Supreme Court in Collier, it was the trial court's responsibility to first determine whether defendant had made a prima facie showing of a purposeful discrimination and that in making the determination it should consider all relevant circumstances.
The court specifically noted each of the showings which a defendant must make under Batson to establish a prima facie case and that no single relevant circumstance is controlling in making the determination of whether a prima facie case has been established. The court further noted that it understood and realized that, even if a jury was composed entirely of black individuals, the use of even one peremptory challenge by the state to exclude a black person (based on race) during the selection of a jury would amount to a Batson violation.
In ruling that defendant had not established a prima facie case of purposeful discrimination, the trial court indicated that it had considered all the relevant circumstances present in this case, including the peremptory challenges exercised by the state and the race of the eleven persons selected to the jury. Specifically, (consistent with the earlier statements made by the prosecutor in response to the Batson objection) the court stated that of the eleven jurors that had been selected at that time five were black and six were white persons and that of the five peremptory challenges which had been used by the state, four were used to exclude black individuals. The court also observed that the state had accepted Mr. McCullough, a black male, peremptorily excused by the defense. In conclusion, the court stated that, considering *345 all the relevant circumstances in this case, there was no pattern of strikes against black prospective jurors.
The record reflects that after the ruling, when voir dire examination resumed, the twelfth position on the jury was filled by a white male and that a single alternate juror, a black female, was selected. The record further reflects that only one peremptory challenge was used after voir dire resumed, a defense challenge to exclude a white female.
Our review of the instant record reveals that the trial court's statements concerning the racial composition of the jury, the number of peremptory strikes used by the state and those used against blacks, and the use of a defense peremptory challenge to exclude Mr. McCullough, the black prospective juror accepted by the state, are supported by the record. Our examination of the entire record of voir dire examination discloses nothing in the prosecutor's questions or statements he made during voir dire to support any inference of a discriminatory purpose. Although the state used a total of five peremptory challenges, four of which excluded blacks, had discrimination been its purpose, the state could have peremptorily challenged any or all of the five blacks that were seated on the jury or the black alternate juror. See State v. Brown, 522 So.2d 1110, 1115 (La.App. 1st Cir.1988), writ denied, 548 So.2d 1222 (La.1989). Additionally, if defendant had accepted Mr. McCullough as the state did, the twelve-person jury would have been composed of six blacks and six whites. Under the circumstances, we find no abuse of discretion by the trial court, and thus, we will not disturb the court's ruling that defendant failed to establish a prima facie case.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE:
By means of these assignments, defendant contends that the jury's verdict was contrary to the law and the evidence and that the trial court erred by failing to grant his motion for post verdict judgment of acquittal. He argues that the state failed to prove he had the specific intent to distribute cocaine, a requisite element of attempted distribution of cocaine; defendant asserts that, because the state failed to prove that the "white powdery substance" allegedly transferred from him to Johnson and Gallagher was cocaine, the evidence fails to exclude the reasonable hypothesis of innocence that he intended to distribute a counterfeit substance. Additionally, Chatman asserts that his conviction should be reversed because he established the defense of entrapment by a preponderance of the evidence and because the state failed to prove a "predisposition" on the part of defendant "to distribute cocaine."

SUFFICIENCY OF THE EVIDENCE
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which has been codified in LSA-C.Cr.P. art. 821. The appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984).
A defendant is guilty of the crime of distribution of cocaine if he knowingly or intentionally distributes cocaine. LSA-R.S. 40:967A(1). Only general criminal intent is required. See State v. Banks, 307 So.2d 594, 596 (La.1975). Such intent is established by mere proof of voluntary distribution. State v. Williams, 352 So.2d 1295, 1296 (La.1977).
The term "distribute" is defined in LSA-R.S. 40:961(13) as meaning:
"Distribute" means to deliver a controlled dangerous substance whether by physical delivery, administering, subterfuge, furnishing a prescription, or by filling, packaging, labeling or compounding the substance pursuant to the lawful order of a practitioner. "Distributor" *346 means a person who delivers a controlled dangerous substance as herein defined.
The term "deliver" is defined in LSA-R.S. 40:961(9) as "... the transfer of a controlled dangerous substance whether or not there exists an agency relationship." In addition, the case law has defined "deliver" as transferring possession or control. State v. Martin, 310 So.2d 544, 546 (La. 1975).
Transfer of possession or control, i.e., distribution, is not limited to an actual physical transfer between the culpable parties. State v. Gentry, 462 So.2d 624, 627 (La.1985). Rather, distribution may be accomplished by the imposition of a third party.
An attempt is defined in LSA-R.S. 14:27A and B, in pertinent part, as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt ...
LSA-R.S. 14:10(1) defines specific intent, as follows:
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
Although specific intent may be proven by direct evidence, such as by statements of the defendant, it need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Hicks, 554 So.2d 1298, 1302 (La.App. 1st Cir.1989), writ denied, 559 So.2d 1374 (La.1990).
Thus, to be found guilty of attempted distribution of cocaine, a defendant must have a specific intent to distribute cocaine and do or omit an act for the purpose of and tending directly toward the accomplishing of his object.
When considered in the light most favorable to the state, the evidence presented at trial overwhelmingly proved beyond a reasonable doubt all of the elements of attempted distribution of cocaine. Such a conclusion readily follows based on Johnson's testimony and/or defendant's testimony concerning the discussions and transaction which occurred when Johnson and Gallagher went to Chatman's residence on September 15, 1988. The testimony of Johnson and defendant established that defendant did acts tending directly toward the accomplishing of his object (the distribution of cocaine) and that defendant and Johnson consistently referred to the substance secured and delivered by defendant as cocaine. Although there was overwhelming circumstantial evidence of defendant's specific intent to distribute cocaine, independent of that evidence there was sufficient direct evidence through Chatman's own testimony proving his specific intent to distribute cocaine, i.e., his consistent references to the substance (he secured from his supplier and delivered) as cocaine.[11]
Defendant's assertion that the state failed to prove that the substance he delivered to Gallagher and Johnson was cocaine and that as a consequence thereof the state failed to exclude the reasonable hypothesis *347 of innocence that he intended to distribute a counterfeit substance is devoid of merit for two reasons. One, to commit the crime of attempted distribution of cocaine it was unnecessary for the state to prove that defendant actually distributed cocaine, because actual distribution is not an element of attempted distribution of cocaine; thus, whether the substance distributed by defendant was in fact cocaine is of no moment. Two, the rule of circumstantial evidence set forth in LSA-R.S. 15:438 (which is applicable only where an essential element of the crime is not proven by direct evidence) was inapplicable in this case in which all of the elements of attempted distribution of cocaine were proven by direct evidence.
Nevertheless, we note that notwithstanding any assertion of defendant to the contrary, the state need not introduce scientific evidence to prove the identity of a controlled dangerous substance. As long as there is sufficient lay testimony or circumstantial evidence from which a jury could find beyond a reasonable doubt that a substance was identified beyond a reasonable doubt, the lack of scientific evidence does not warrant reversal. U.S. v. Sanchez DeFundora, 893 F.2d 1173, 1175 (10th Cir.), cert. denied, 495 U.S. 939, 110 S.Ct. 2190, 109 L.Ed.2d 518 (1990). "Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence..." United States v. Scott, 725 F.2d 43, 45-46 (4th Cir.1984) (quoting United States v. Dolan, 544 F.2d 1219, 1221 (4th Cir. 1976)). Circumstantial evidence of identity can include lay experience based on familiarity through prior use, trading, or law enforcement; and behavior characteristic of sales and use such as testing, weighing, cutting and peculiar ingestion. United States v. Harrell, 737 F.2d 971, 978 (11th Cir.1984), cert. denied, 469 U.S. 1164, 105 S.Ct. 923, 83 L.Ed.2d 935; 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985). See also United States v. Brown, 887 F.2d 537, 542 (5th Cir.1989); United States v. Meeks, 857 F.2d 1201, 1204 (8th Cir.1988) (cases in which circumstantial evidence was found sufficient to prove the identity of a substance).

ENTRAPMENT
An entrapment is perpetrated when a law enforcement official or a person acting in cooperation with such an official, for the purpose of obtaining evidence of the commission of an offense, solicits, encourages, or otherwise induces another person to engage in conduct constituting the offense when the person is not otherwise disposed to do so. State v. Batiste, 363 So.2d 639, 641 (La.1978). Entrapment is a factual defense on the merits. State v. Bates, 301 So.2d 619, 621 (La.1974); State v. Augustus, 479 So.2d 590, 591 (La.App. 1st Cir.1985). The defendant bears the burden of production of evidence in support of his defense of entrapment and, having done so, he has the burden of persuading the trier of fact of the existence of facts constituting the defense by a preponderance of the evidence. State v. Prudhomme, 532 So.2d 234, 240 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 871 (La. 1989); State v. Cook, 460 So.2d 1075, 1083-1084 (La.App. 2nd Cir.1984), writs denied, 466 So.2d 465, 466 So.2d 466 (La.1985). The focal point of inquiry is on the predisposition of the defendant to commit the crime at issue, as well as on the conduct of the police. State v. Richards, 426 So.2d 1314, 1318 (La.1982); State v. Deville, 524 So.2d 1334, 1337 (La.App. 1st Cir.), writ denied, 531 So.2d 263 (La.1988). The entrapment defense will not be recognized when the law enforcement official merely furnishes the accused with an opportunity to commit a crime to which he is predisposed. State v. Brand, 520 So.2d 114, 117 (La.1988).
*348 The evidence of record in this case overwhelmingly shows that Gallagher and Johnson merely furnished the opportunity for defendant to commit the crime of attempted distribution of cocaine. Chatman readily, willingly and actively engaged in this criminal conduct. His admission that he asked for and received marijuana from Gallagher after the September 15 transaction as compensation for delivering the substances to Gallagher and Johnson and his admission that he smoked marijuana and had purchased marijuana numerous times were indicative of his predisposition to commit the instant offense.
Viewing the evidence of record in the light most favorable to the prosecution, a rational trier of fact could have found that defendant did not prove the affirmative defense of entrapment by a preponderance of the evidence. See State v. Brand, 520 So.2d at 118.
These assignments lack merit.
ASSIGNMENT OF ERROR NUMBER FOUR:
By means of this assignment, defendant contends that the trial court erred by imposing an excessive sentence.
Article I, § 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Hawkins, 496 So.2d 643, 649 (La.App. 1st Cir.1986), writ denied, 500 So.2d 420 (La.1987). In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d at 767. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether or not a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether or not the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355, 358 (La.1980). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Payne, 540 So.2d 520, 524 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989).
A trial court's reasons in imposing sentence, as required by LSA-C.Cr.P. art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. State v. Hicks, 554 So.2d 1298, 1305 (La.App. 1st Cir.1989), writ denied, 559 So.2d 1374 (La.1990). The trial court need not recite the entire checklist found in LSA-C.Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645, 653 (La.1984). Even when the trial court has not complied with LSA-C.Cr.P. art. 894.1, this court need not remand the case for resentencing unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Carr, 530 So.2d 579, 592 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La.1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
Attempted distribution of cocaine is punishable by imprisonment at hard labor for a minimum of two and one-half years and a maximum of fifteen years and a possible fine of not more than seven thousand five hundred dollars. LSA-R.S. 40:967B(1) and 40:979A. Herein defendant was sentenced to imprisonment at hard labor for a term of three years, and the court imposed a fine of fifteen hundred dollars.
The court ordered a presentence investigation report; and, at the beginning of the sentencing hearing, the court noted that defense counsel had been given an opportunity to review the report and that defense counsel wanted to make a statement concerning a portion of the report dealing with defendant's prior military service. Defense counsel then stated that, while the report states that defendant had no prior *349 military history, in fact defendant had served in the United States Navy for three and one-half years and had been honorably discharged from the Navy. Defendant indicated that information was correct and that otherwise the presentence investigation report was correct.
After noting defendant's statement in the presentence investigation report (indicating that Tom Gallagher had intentionally implicated him in the instant offense), the trial court stated the following in articulating its reasons for sentencing:
Prior criminal record, I show that you have no prior juvenile record.
Insofar as an adult record is concerned, I show an arrest on April 15th, 1988, for issuing worthless checks; that was deadfiled by the D.A.'s office because restitution was made.
We have an August 2nd, '88 arrest, for some animal control matter; that was not formally billed.
And then, we have the instant arrest and conviction. So this is your first conviction of any kind. You are before the court as a first felony offender, and under the law, are, technically, eligible for probation.
Social history, showing you are (sic) married in 1978, two minor children. You've already commented upon your prior military service. A graduate of Capital High School. You profess to be a social drinker. You admitted to using marijuana over the past several years. You vehemently deny the use of cocaine.
You had a very good job prior to all this, employed by the U.S. Post Office since 1979. At the time of the presentence report, you were on administrative leave without pay. But since this conviction, I assume your job has been terminated. I think a felony conviction, under the Post Office Regulations, is grounds for automatic termination.
The facts of this case show that this offense involved two ounces of cocaine, which is fifty-six grams of cocaine.
In my experience on the criminal bench, from the evidence I heard at the trial, this is a substantial quantity of cocaine. And but for that substantial quantity of cocaine, looking at your social history and your prior criminal record, or lack thereof, I would have no problems with placing you on probation.
Looking at the sentence guidelines of Article 894.1 of the Code of Criminal Procedure, Subsection B, certainly, looking at those twelve guidelines, you would most likely fit into some type of probationary program.
However, looking at subsection A, and the quantity of cocaine involved in this case, the fact that you were not a user but were distributing, it's felt by the court that any lesser sentence than incarceration will deprecate the seriousness of this offense.
Selling cocaine on the streets of this city, this parish and this state, I don't think there's any more serious offense than that. As I've said, fifty-six grams, or two ounces, is a substantial quantity of cocaine.
Because of that, this court feels that your commitment to a correctional facility for custodial care can be provided most effectively, and only by commitment.
The sentencing reasons given by the trial court reflect that the court carefully considered defendant's background, the circumstances of defendant's crime and aggravating and mitigating factors. The three year term of imprisonment meted out to defendant is only slightly above the minimum sentence and the fifteen hundred dollar fine is at the lower end of the authorized fine for the offense. Under the circumstances of this case, we are unable to say that the trial court abused its discretion in imposing defendant's sentence. Hence, we do not find the sentence to be excessive.
This assignment lacks merit.
For these reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] In defendant's motion for post verdict judgment of acquittal, he alleged, in pertinent part, that the trial court should grant a judgment of acquittal on Count III because the state failed to prove by reliable scientific evidence that the "white powdery substance" he allegedly distributed was cocaine, that the evidence viewed in the light most favorable to the state did not support the jury's verdict of guilty of distribution of cocaine, and that the evidence viewed in the light most favorable to the state did not support a finding of guilt as to any lesser and included responsive offense.

In issuing the ruling modifying the jury's verdict on Count III and entering the judgment of conviction on the lesser and included offense of attempted distribution of cocaine, the trial court stated that it agreed with the "reasons" set forth in the motion for post verdict judgment of acquittal, but the court further stated that it thought the proper remedy was a reduction of the verdict and not a judgment of acquittal.
[2] Although the pertinent minute entry of the district court indicates that (as part of defendant's sentence) defendant was ordered to pay victim reparation costs of one hundred dollars, the transcript of sentencing fails to indicate that payment of any victim reparation costs was ordered in this case. Where there is a discrepancy between the minute entry and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
[3] Gallagher, the confidential informant or "cooperating individual" who was identified as CI 440-21 in the police reports, did not testify at defendant's trial.
[4] Krug testified that Gallagher, who was allowed to continue working at the post office, was paid only for the time he worked at the post office, and that the decision of whether or not Gallagher was to keep his job was the decision of the postmaster at the main post office in Baton Rouge. More specifically, Krug indicated that Gallagher was not paid for any time spent assisting the officers in their investigation, except insofar as Gallagher was being paid for time working as an employee at the post office.
[5] The trial court ruled that the tapes of the telephone conversations between Gallagher and defendant and the tapes of the conversations which occurred in the presence of the transmitter were inadmissible at trial.
[6] The evidence introduced concerning the August 17 meeting formed the basis for Count I as to which defendant was acquitted. The bill of information used the date "on or about August 18, 1988" in reference to the offense charged in Count I; however, the testimony given at trial indicated that the date of the charged offense was actually August 17, 1988.
[7] There was no evidence presented at trial indicating that the officers found any drugs in Gallagher's vehicle or on his person when he and his vehicle were searched following his return to the EBRSO after the August 26 meeting with defendant.
[8] The evidence pertaining to the August 27 meeting between Gallagher and defendant served as the basis of Count II, on which defendant was also acquitted.
[9] The meeting on September 15 formed the basis of Count III, the count on which the trial court rendered the modified verdict of guilty of attempted possession of cocaine.
[10] Krug testified that State Exhibit S-3, the substances, did not have the same appearance at the time of trial as they had on September 15, 1988; he explained that on September 15, the substances were "rocked up," i.e., harder than their condition at trial and that the condition of the substances at trial was the condition in which the substances were returned from the laboratory in Washington, D.C. Krug further testified that the same change in the condition of State Exhibits S-1 and S-2 had occurred after those were returned from the same laboratory. The record does not reflect that evidence of the results of the laboratory analyses of the substances in S-1, S-2 or S-3 was ever introduced at the trial or that there was any stipulation by the state and the defense in regard to the results of the laboratory analyses.
[11] Direct evidence of defendant's specific intent is reflected in his testimony on direct examination that (with the exception of the September 15, 1988, transaction) he had never bought or sold cocaine. Additional direct evidence of defendant's specific intent was given during the following testimony on cross-examination:

Q Did you know it was against the law?
A Yes.
Q Did you know that was a whole lot of cocaine; or a whole lot of money?
A Yes. But let me make thisI hadn't never (sic) used cocaine. I never (sic) been around cocaine to know how, you know, how much you can make off (sic) cocaine, or how much, what is what, so I didn't realize that this could occur from that amount of cocaine.
Q I don't know that I understand your answer.
A Okay. The two, the two ounces of cocaine that I'd (sic) went and got for Mr. Tom Gallagher and [Johnson] is