625 So.2d 1377 (1993)
STATE of Louisiana
v.
Donald ARBUTHNOT.
No. KA 92 2166.
Court of Appeal of Louisiana, First Circuit.
October 15, 1993.
*1378 Doug Moreau, Dist. Atty. by Lou Daniel, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Office of Public Defender, Baton Rouge, for defendant-appellant.
Before CARTER, GONZALES and WHIPPLE, JJ.
GONZALES, Judge.
Donald Arbuthnot (along with his codefendant, Edward Johnson) was indicted for two counts of armed robbery (counts 1 and 2), violations of La.R.S. 14:64; eight counts of second degree kidnapping (counts 3 through 9 and 11), violations of La.R.S. 14:44.1; and one count of attempted first degree murder (count 10), a violation of La. R.S. 14:27 and 14:30. (In the same indictment, Johnson was additionally indicted for aggravated burglary (count 12), a violation of La.R.S. 14:60.) Arbuthnot pled not guilty and, after trial by jury, was convicted on all counts as charged. The court sentenced him on count 1 to serve a term of eighty-five years imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. The court sentenced him on count 2 to serve a term of eighty-five years imprisonment at hard labor, concurrent with count 1. The court sentenced him on each of counts 3 through 9 to serve a term of twenty years imprisonment at hard labor, concurrent with each other and concurrent with count 1. The court sentenced him on count ten to serve a term of forty-five years imprisonment at hard labor, consecutive to count 1; *1379 and on count 11 to serve a term of thirty years imprisonment at hard labor, consecutive to count 1.[1] On each count, the court credited defendant with time served. Arbuthnot appeals his convictions urging five assignments of error. Assignments numbers one and two were not briefed on appeal and, therefore, are considered abandoned. See Uniform RulesCourts of Appeal, Rule 2-12.4.[2]
FACTS
On October 30, 1991, defendant and Edward Johnson robbed the Sunburst Bank branch office located on Essen Lane in Baton Rouge. At about ten minutes before noon, a man dressed as a woman entered the bank, walked up to Susan Kolb (the branch manager), told her to get the other workers together at the front of the bank, and told the employees not to pull any alarms. About thirty seconds later, a second man, wearing a white mask and wig, came into the bank, holding a gun. Pointing the gun, the masked man ordered everyone to "hit the floor." After the four bank employees complied, the man dressed as a woman told them to stand again. The employees then were forced to stand up against the vault and face the wall.
The man dressed as a woman demanded to get into the vault. Kolb told him she did not have access to the vault because the teller with the keys to the vault was at lunch. In response to his demands, Kolb and one of the tellers (Marcia Krumm) emptied the money out of Krumm's drawer. The man dressed as a woman repeatedly told the women to hurry. He warned them not to pull any alarms and not to give him any "exploding" money. He also indicated his willingness to harm them if they did not cooperate. The women put the money into purses provided by the robbers. Kolb saw a gun in the bottom of one of the bags. The women took out all the money from Krumm's drawer except for the dye pack (which would explode and give off a red dye upon leaving the bank) and the bait money (which would trigger a silent alarm by its removal from the drawer). Seeing money left in the drawer, the man dressed as a woman complained. Kolb then told Krumm to give him all the money. After emptying that drawer, Kolb went to the drive-through teller's window and similarly emptied that station.
When Kolb and the man dressed as a woman returned to the vault area, the other employees and the masked robber were not there. The robber dressed as a woman told Kolb he was not leaving until he got into the vault. He also warned her that, if the police arrived before he got into the vault, somebody would be hurt. Knowing the police already were being notified by the removal of the bait money, Kolb followed a complicated procedure and used several keys to open the vault. After the vault was opened, Kolb and the robber removed the money. Kolb estimated the robbers stole almost fifty-one thousand dollars.
While Kolb was emptying the teller drawers and the vault, the masked robber forced the three other employees and three customers who had happened to enter the bank during the robbery into a small dark bathroom. Threatening the victims with a gun, the masked man told them to face the wall, get on their knees, and stay put. When Kolb finished taking the money out of the vault, she also was brought to the bathroom. Before shutting the door completely, the robbers warned the victims not to try to leave. After about thirty to forty-five seconds, the *1380 victims debated whether or not it was finally safe for them to get up. Eventually, a customer volunteered to check. After realizing the robbers had left the bank, the victims left the bathroom and called the police.
Throughout the robberies, the employees and customers were extremely frightened. The robbers were very stern and direct and used profanity as they issued orders to the employees and customers. A bank employee described the gun used by the masked man as having a six inch barrel. A customer described the gun he saw as being a machine gun. While holding the employees and customers at the vault, the masked robber used his hand to force the victims' heads down so they would have to look at the floor. After being placed in the bathroom, the victims feared they would be shot. One customer explained, "Were we going to make it through this was an issue. Were we going to get out of it alive, were we going to be taken hostage, or were we going to be raped."
After leaving the bank, the robbers got into a grey Lincoln Continental and rapidly drove away. Witnesses at a nearby bank noticed red smoke coming out of the interior of the car and saw the two occupants attempt to fan the smoke out of the car. At the same time, Lane White was leaving a nearby hospital. Curious about the unusual red smoke, he followed the getaway car, unaware the bank had been robbed. He saw the robbers drive onto the interstate and exit at Siegen Lane. In a motel parking lot, the men got out of the car, wiped the outside of the car, and then left in a black Pontiac (identified by a friend of the two robbers as being Arbuthnot's car). While the men were in the parking lot, White called 911 from a pay telephone, giving descriptions of the men, the vehicles, and the direction of travel.
As a result of the information provided by White, law enforcement authorities spotted the Pontiac driving on the interstate. Corporal Wayne McKeller of the East Baton Rouge Parish Sheriff's Office followed the car until it got off the interstate at College Drive. At that point, McKeller tried to stop the vehicle using his lights and siren. In response, the Pontiac sped away eventually turning onto a street which dead ends behind a school. Seeing the fence, the driver of the Pontiac slammed on the brakes. One of the occupants of the Pontiac jumped out of the vehicle and ran toward McKeller's unit, firing an automatic revolver several times at McKeller. McKeller identified Johnson as being the person who fired at him. One of the shots struck the front of McKeller's unit. When McKeller was unable to get his vehicle quickly into reverse gear, he returned fire. Johnson stopped firing apparently because of a misfire. After McKeller started firing, Johnson ran back to the Pontiac. McKeller then saw the Pontiac being driven through the fence and into the school yard. When backup assistance arrived, McKeller went to the school area and saw someone running from the direction of the car toward the school. He identified Arbuthnot as being this person.
After apparently stalling in the muddy school playground, Johnson and Arbuthnot got out of the Pontiac and ran toward the school. A teacher at the school observed one of the men who got out of the Pontiac fire his weapon as if for cover. An extensive search, involving thirty to fifty units from local, state, and federal law enforcement agencies, was conducted in an effort to locate the robbers. After leaving the school area, the robbers ran to a nearby dental laboratory where they found Charles Slain eating his lunch in his car in the parking lot. Johnson got into Slain's vehicle on the driver's side, pointed what Slain believed was a gun into Slain's side, and told Slain he was being robbed. Arbuthnot got into the car on the passenger side penning Slain in the middle of the front seat. The two men asked Slain if he had any money and if his car had any gas. Slain replied that his car was empty. When one of the officers involved in the chase approached the car, Arbuthnot opened the door and asked the officer what was happening. When the officer replied that he was looking for two bank robbers, Arbuthnot asked if it was safe for them to get out of the car. The officer suggested that they stay put. After about twenty or twenty-five minutes, an employee from the lab told Slain the boss wanted the door to the lab closed. By now the people working in the lab were *1381 aware the police were searching the neighborhood. Slain warned the men his coworkers would think something was wrong if he did not return to work. Johnson and Arbuthnot allowed Slain to get out of the car and then followed him into the lab. After the men had been inside the lab for a few minutes, Slain was finally able to tell a coworker that the men were the robbers for whom the police were searching. The boss then told the men they would have to leave.
After Johnson and Arbuthnot left the lab, Reserve Deputy Timothy Marioneaux located them behind some bushes and told them to come out with their hands up. Arbuthnot cooperated and was arrested at the scene. Johnson eluded Marioneaux and continued running through the neighborhood eventually entering the residence of Walter and Diane Kirkland on Goodwood Boulevard. In the home, he told the housekeeper, Gloria Ross, and the Kirkland's six year old son, Mason, that he would not hurt them if they did as he said. When he wanted some water, he sent the housekeeper downstairs to get it. Before she left to get the water, Johnson put his hands around the boy's neck and warned her that he would break the boy's neck if she did not cooperate.
When Mrs. Kirkland woke up from a nap, Johnson told her he needed some clothes and shoes. As Mrs. Kirkland took him into a bedroom, the housekeeper and young boy escaped out the back door. To protect her son and housekeeper, Mrs. Kirkland offered to drive Johnson wherever he wanted. As she pulled her car out of the driveway, Mrs. Kirkland saw her housekeeper talking to a police officer. She then drove Johnson through the neighborhood, avoiding blockades which had been put up by the police. After driving Johnson past the area monitored by the police, Mrs. Kirkland reminded him that the police would be looking for her vehicle. Johnson then got out of the car and started running. That night authorities arrested Johnson after an anonymous caller informed them of his location.
The police recovered most of the money stolen during the robbery. A large part of the money, most of it dyed red, was found in the black Pontiac which the robbers abandoned at the school. More money, a Star .45 automatic pistol and some ammunition were found behind a residence in the neighborhood when the police returned to the area the next day to search for items dropped by officers during the chase. A firearms expert compared the Star pistol and spent casings found at the location where Johnson fired at McKeller and determined the casings had been ejected from the Star pistol. Additionally, the police recovered a 9 millimeter semi-automatic pistol in the trunk of the Pontiac. The weapon was loaded and ready to fire; and the firearms expert estimated the weapon was capable of firing thirty rounds per second. Clothing identified as that worn by the robbers also was found in the Pontiac. The items found in the Pontiac had red dye on them.
STATE'S USE OF PEREMPTORY CHALLENGES
In the third assignment of error, defendant argues the court erred when it overruled his objection to the prosecutor's use of peremptory challenges to remove two black prospective jurors. Defendant claims the state's explanations for challenging the two jurors were insufficient.
The Equal Protection Clause prohibits both the prosecution and the defense from using peremptory challenges to exclude otherwise qualified and unbiased persons from a petit jury solely because of their race. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). See also Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); State v. Knox, 609 So.2d 803 (La.1992) (per curiam).
Under Batson and its progeny, after a timely objection, a defendant complaining of the state's use of peremptory challenges must demonstrate a prima facie case of purposeful discrimination. To do so, the defendant must establish that the prosecutor has exercised peremptory challenges to exclude people from the jury on account of their race. The trial court then must determine whether or not the defendant has established the requisite prima facie case. In making this determination, the court should consider all relevant circumstances, including *1382 any pattern of strikes by the prosecutor against jurors of a particular race and any questions or statements by the prosecutor during voir dire examination or in exercising the challenges which may support or refute an inference of purposeful discrimination. See State v. Collier, 553 So.2d 815, 818-19 (La.1989). See generally State v. Chatman, 599 So.2d 335, 343-44 (La.App. 1st Cir.1992).
Once the defendant makes a prima facie showing of purposeful discrimination, the burden shifts to the prosecutor to come forward with neutral explanations for challenging the jurors. The neutral explanations must be clear, reasonably specific, legitimate, and related to the particular case at bar. After the prosecutor has presented reasons for use of the peremptory challenges which are facially race neutral, the trial court must assess the weight and credibility of the explanations in order to determine whether or not there was purposeful discrimination in the use of the challenges. Collier, 553 So.2d at 820. Because a trial court's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. See Collier, 553 So.2d at 822.
In the instant case, defendant objected to the dismissal by the state of two blacks, Bessie Hilliard and John Higginbotham. At the time of the objection, only two panels with a total of twenty-three prospective jurors had been questioned. Of these prospects, six persons (including two black jurors) had been sworn as jurors. The state had exercised three peremptory challenges (one for a white juror and two for blacks). Defendants combined had challenged fourteen white prospective jurors.
After the court ruled a prima facie case of discrimination had been shown, the district attorney stated his reasons for challenging Hilliard and Higginbotham. He explained that he challenged Hilliard because he was not satisfied she had sufficient intellect to handle the twelve count indictment. He claimed he had asked her questions "around the clock" to evaluate her thought processes and was not satisfied she followed the questions he asked. As to Higginbotham, the district attorney indicated he did not consider the juror dependable because of his employment history. He explained that Higginbotham had worked four different jobs in the last five years, including only three months in the present position and four months at the previous job. After hearing these explanations, the court found the state's reasons for challenging the jurors to be neutral and unrelated to race.
We find the justifications given by the state for peremptorily challenging these two black prospective jurors are race neutral. In its appellate brief, the state claims Hilliard spoke slowly and sometimes inaudibly and always seemed to be "one-half step behind the conversation." This specific information was not given by the district attorney when he stated his reasons for challenging Hilliard; and the written record before this Court, by its very nature, cannot support this claim. However, the transcript of the state's questioning of Hilliard supports the state's assertion that it was concerned about her ability to process the law applicable in this case. The prosecutor gave all of the jurors a lengthy discussion of the legal principles applicable in the case. After asking Hilliard some preliminary questions and hearing her responses, he specifically inquired if service on the jury would make her uncomfortable, and he also asked her the following: "Do you understand now you are not being asked to do anything, if you serve on this jury, that you are not well capable of doing?" Additionally, when asked about a recent news story dealing with her place of employment, Hilliard responded that she was not aware of the story.
The state may properly exclude a juror who does not have sufficient intellect to understand the legal issues involved in a case. See State v. Young, 569 So.2d 570, 578 (La. App. 1st Cir.1990), writ denied, 575 So.2d 386 (La.1991). See also State v. Dukes, 609 So.2d 1144, 1158 (La.App.2d Cir.1992), writ denied, 618 So.2d 402 (La.1993). In rejecting defendant's Batson objection to the state's challenge of Hilliard, the trial court properly accepted the prosecutor's race neutral explanations, a choice entitled to great deference on appeal.
*1383 We also find the state's explanation for challenging Higginbotham to be race neutral. During questioning by the district attorney, Higginbotham stated that he had been employed at the City-Parish landfill for about three months. Previously, he worked four months at the Metro Airport. Although Higginbotham earlier had a steady work history (working five years as a truck driver for a flower shop and five years for a department store), his recent employment changes supported the state's concern. The state's interest in the employment background of the jurors was evident in the questions asked by the state of each juror. After reviewing the record of the entire voir dire proceeding, we find no abuse of discretion in the trial court's ruling that there was no purposeful discrimination either in the challenge of Hilliard or of Higginbotham. This assignment of error is without merit.
SUFFICIENCY OF THE EVIDENCE
In the fourth assignment of error, defendant maintains the evidence was insufficient to support the guilty verdicts for second degree kidnapping. Relying on the different language used in the false imprisonment while armed with a dangerous weapon statute (La.R.S. 14:46.1) and second degree kidnapping statute (La.R.S. 14:44.1), he specifically argues that by shutting the bathroom door he merely "confined or detained" the employees and customers at the bank (as covered by the false imprisonment statute) and did not "imprison" them as required by the second degree kidnapping statute. Defendant does not contest the sufficiency of the evidence on the remaining counts.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
Second degree kidnapping is defined as follows:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
La.R.S. 14:44.1. The provisions of this statute apply when any one occurrence mentioned in Subsection (B) combines with any one occurrence enumerated in Subsection (A). State v. White, 593 So.2d 882, 887 (La. App.2d Cir.1992).
During the robberies at the bank, defendant and his cohort forcibly prevented the bank employees and customers from leaving. The robber who wore the mask pointed a gun at the victims and required them to stand facing the vault with their heads down. Eventually, the masked robber ordered the victims at gunpoint to go down a hallway and into a bathroom. He made them get down on their knees and remain still in the small dark room. When the last employee was brought into the bathroom, the robbers warned the victims not to get up. The robbers then shut the door to the bathroom completely. Thus, defendant and his accomplice forcibly seized and carried the victims from one area of the bank to another (Subsection (B)(1)), and then imprisoned and forcibly secreted the victims in the bathroom (Subsection (B)(3)), all while armed with a dangerous weapon (Subsection (A)(5)). The *1384 statute does not require imprisonment for any minimum period of time; nor does it require that the distance traveled during the forcible seizure be any particular length. See White, 593 So.2d at 887. Defendant's argument that the words "imprison" (used in the second degree kidnapping statute) and "confine" (used in the false imprisonment statute) have different meanings is meritless. The two words are synonymous. Accordingly, we find sufficient evidence to support defendant's guilt for second degree kidnapping on counts 3 through 9.
In the parking lot outside the dental laboratory, Johnson forced his way into Slain's car, pointed something into Slain's side which Slain thought was a gun, and told Slain he was being robbed. Arbuthnot then got into the car on the other side penning Slain in the middle of the front seat. Johnson and Arbuthnot knew the police would be looking for only two men. When an officer came to the parking lot, Arbuthnot boldly asked the officer what was wrong and if it was safe for them to get out of the car. When the officer responded that he was looking for two bank robbers, Slain knew the two men in his car must be the robbers. The men warned Slain not to look at them and indicated they would not try to hurt him. During the twenty to twenty-five minutes Slain was held in his vehicle, he did not try to leave because he was not sure what would happen to him and he did not want to take any chances. Thus, defendant and his cohort imprisoned Slain in his car (Subsection (B)(3)), while using Slain to facilitate their flight after commission of the felonies (Subsection (A)(2)), and while leading Slain to reasonably believe Johnson was armed with a dangerous weapon (Subsection (A)(5)). Accordingly, we find the evidence sufficient to support defendant's guilt of second degree kidnapping on count eleven.
This assignment of error is without merit.
EXCESSIVE SENTENCES
In the fifth assignment of error, defendant asserts the court imposed excessive sentences and failed to comply with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1. He specifically argues that the court's imposition of consecutive sentences was the needless imposition of pain and suffering and that the court erred by not considering any mitigating circumstances.
Initially we note that the sentences imposed on defendant are well within the statutory limits. The penalty for armed robbery is imprisonment at hard labor for not less than five years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. La.R.S. 14:64(B). The penalty for second degree kidnapping is imprisonment at hard labor for not less than five nor more than forty years, with at least two years of the sentence imposed without benefit of parole, probation, or suspension of sentence. La.R.S. 14:44.1(C). The penalty for attempted first degree murder is imprisonment at hard labor for not more than fifty years. La.R.S. 14:27(D)(1) and 14:30(C).
In sentencing defendant, on June 5, 1992, the court did not refer to the Louisiana Sentencing Guidelines which became effective on January 1, 1992. See 17 La.Reg. 1186 (Dec. 20, 1991). However, the court stated several factors which influenced it in determining the sentences to impose. The court noted that defendant's crime spree, which resulted in the instant convictions, consisted of several separate and distinct occurrences, as well as some offenses which were part of one continuous transaction. Reviewing defendant's past criminal record, the court indicated defendant was classified as a fifth felony offender. The four previous felony convictions were for manslaughter, possession of barbiturates, armed robbery, and simple escape. Defendant has been arrested for thirty-two different crimes, including twenty-three felonies. Because defendant is forty years old, the court concluded he was not a youthful offender. The court also determined that defendant was a violent and unstable person. Because of defendant's ability to mastermind the instant offenses, the court believed defendant's actual IQ was not as low as that stated in the pre-sentence investigation report (60).
After the sentencing, defendant filed a motion to reconsider sentence. In the motion, he complained that the court denied his attorney's *1385 request for a sentencing hearing, that the court failed to state the aggravating and mitigating circumstances considered by it in imposing sentence, and that the sentences were excessive. On appeal, defendant renews his complaint concerning the court's alleged failure to state the circumstances considered in imposing sentence. He specifically claims the court failed to articulate any mitigating circumstances it considered and maintains that, if there were no mitigating circumstances, the court should have noted that fact in order to comply with La.C.Cr.P. art. 894.1. Defendant additionally argues the court was not justified in imposing consecutive sentences.
For the following reasons, we will not consider the argument defendant makes on appeal concerning the court's imposition of consecutive sentences. Article 881.1(A)(2) of the Code of Criminal Procedure requires a party who is filing a motion to reconsider sentence to state in the motion the specific ground on which the motion is based. A party is precluded from urging on appeal any ground which was not raised in the motion to reconsider. La.C.Cr.P. art. 881.1(D). Thus, in the instant case defendant's mere claim to reconsider that the sentences are "excessive" was insufficient to preserve the claim he now attempts to raise on appealthat the court erred by imposing consecutive sentences. See State v. Mims, 619 So.2d 1059 (La.1993) (per curiam).
Additionally, we find no merit in defendant's claim the court erred by not considering any mitigating circumstances. On appeal, defendant does not mention any mitigating factors which the court should have considered. After reviewing the record, including the court's comments and the presentence investigation report, the only mitigating circumstance we find is that defendant has a two year old daughter who obviously will suffer as a result of any term of incarceration her father serves.
Neither before the trial court, nor before this Court, has defendant complained that the sentencing judge failed to consider the new sentencing guidelines or that the judge failed to cite sufficient aggravating factors to justify the sentences. Considering the grid level for these convictions (all category 1 crimes) and defendant's criminal history index (at least more than 5 points), the appropriate grid cell for defendant for each sentence would be "1-A." The sentencing range for a typical conviction in this grid cell would be from twenty-seven and one-half years to thirty years. Although the sentences imposed by the court on some of the counts exceed this range, the record reveals numerous aggravating circumstances which, when combined, support the upward departures. Defendant's previous armed robbery conviction was similar to the instant offense. Defendant terrorized a neighborhood supermarket, robbed the employees, threatened the employees and customers while holding them at gunpoint, and used potentially deadly force in an effort to escape. Considering defendant's extensive criminal record, the court's comments, and other information contained in the pre-sentence investigation report, the record supports the sentences imposed in this case. See La.C.Cr.P. art. 881.4(D).
Accordingly, this assignment of error is without merit.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] In reviewing the record for patent error, we find the sentences imposed for counts 2, 3 through 9, and 11 are illegally lenient. Although the minutes do not reveal these errors, the transcript of the sentencing does; and, in the event of a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). The sentence for count 2 (armed robbery) should have been imposed without benefit of probation, parole, or suspension of sentence. See La.R.S. 14:64(B). Additionally, at least two years of the sentences imposed in counts 3 through 9 and 11 (second degree kidnapping) should have been imposed without benefit of parole, probation, or suspension of sentence. See La.R.S. 14:44.1(C). Although the trial court erred by not imposing these restrictions, we will not correct the sentences as the errors are in defendant's favor and the state has not appealed these illegally lenient sentences. See State v. Fraser, 484 So.2d 122 (La.1986).
[2] In a separate appeal (92 KA 2146), Johnson also appeals his convictions and sentences.