846 So.2d 1 (2003)
STATE of Louisiana
v.
William TAVES.
No. 02-709.
Court of Appeal of Louisiana, Third Circuit.
January 15, 2003.
Writ Granted June 6, 2003.
*2 Lawrence C. Billeaud, Guilbeau & Billeaud, Lafayette, LA, for Defendant/Appellant, William Taves.
Calvin E. Woodruff, Jr., Assistant District Attorney, Abbeville, LA, for Plaintiff/Appellee, State of Louisiana.
Court composed of ULYSSES GENE THIBODEAUX, SYLVIA R. COOKS and JIMMIE C. PETERS, Judges.
THIBODEAUX, Judge.
A jury convicted the defendant, William Taves, of second degree kidnapping and *3 false imprisonment. The trial court imposed concurrent sentences of ten years at hard labor on the false imprisonment conviction and twenty-five years at hard labor on the second degree kidnapping charge, with the first two years to be served without the benefit of probation, parole, or suspension of sentence. The defendant appeals both his convictions and sentences.
For the following reasons, we affirm his convictions, but vacate his excessive sentences and remand for resentencing.

ISSUES
We shall consider whether:
(1) the evidence was sufficient to sustain the convictions for false imprisonment and second degree kidnapping;
(2) the trial court committed manifest error in refusing to grant the defendant's motion for a new trial;
(3) trial counsel was ineffective for failing to discover and call several witnesses on behalf of the defendant; and,
(4) whether the sentences are excessive.

SUFFICIENCY OF THE EVIDENCE
The defendant contends the State presented insufficient evidence to support the convictions of false imprisonment and second degree kidnapping.
In State v. Lambert, 97-64, pp. 4-5 (La. App. 3 Cir. 9/30/98); 720 So.2d 724, 726-727, this court explained:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See King, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
La.R.S. 15:438 provides:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
Incorporating this rule under the Jackson standard, an appellate court must determine that viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact would have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded. State v. Honeycutt, 438 So.2d 1303 (La. App. 3 Cir.), writ denied, 443 So.2d 585 (La.1983). This does not mean, however, that every possibility of innocence must be excluded. See generally, State v. Maxie, 93-2158 (La.4/10/95); 653 So.2d 526.
In State v. Johnson, XXXX-XXXX, p. 3 (La.App. 3 Cir. 2/6/02); 817 So.2d 120, 122, the court explained:
... [i]n the absence of internal contradictions or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the factfinder, is sufficient to support a conviction. See State v. Johnson, 00-1552 (La.App. 5 Cir. 3/28/01); 783 So.2d 520.
*4 At trial, Farrah Daigle, the victim, testified she had been with the defendant since 1998 and they had a child together in October 1999. In December 1999, the child died. In January 2000, Ms. Daigle and the defendant rented a home in Abbeville. She described it as a "secluded place by the river." A shooting incident occurred around February 5 or 6 involving her mother's home which was located in Lafayette. Ms. Daigle testified the defendant warned her if she told anyone about the incident he would kill her and he pulled out his .357 Magnum. Ms. Daigle stated when she attempted to phone her mother about the incident the defendant pulled the phone and broke it. According to Ms. Daigle, later that same day she attempted to leave and the defendant pulled a gun on her. Ms. Daigle explained:
A. Well, we got in an argument and I wanted to leave the house; I wanted to leave him. And I wanted everything over and he pulled out the gun on me. And I walked all the way back to the wall as far as I could because I thought he was going to shoot me. And he shot the gun towards my ear, right side of my left ear going towards the wall. It just missed me. And so after that, I knew that he was very capable of killing me.
The State introduced a photograph depicting a bullet exit hole on the exterior of the home into evidence without objection. Ms. Daigle explained when the defendant fired the shot past her ear she was in the living room and the shot was fired face level at her ear.
Ms. Daigle testified that after the shooting incident, the defendant told her she could not leave and he always kept a gun on her. She explained that during February 2000, the defendant carried a .357 Magnum with him at all times, even while he was sleeping. Ms. Daigle stated she told the defendant she wanted to end the relationship. She testified the defendant responded "I was never going to leave him. He was going to kill me before I left him." Ms. Daigle denied having access to a vehicle or a telephone. She explained:
A. The phone would be plugged in, but I had no way of using it. He would always follow me around or if I did use it, he'd monitor my calls. He'd use Star 69 to find out who I called. So I had no privacy if I needed to call anyone important.
Ms. Daigle testified the defendant never left the house during this time except for once around February 21 or 25, when he went to work for training. She stated the defendant took the phone and vehicle with him and was gone only an hour.
Ms. Daigle testified that around February 14, she and the defendant met her friend, Shannon Willis, at a restaurant in Lafayette. When asked why she did not feel she could just walk out of the restaurant, Ms. Daigle responded, "Because he'd kill me. He doesn't care who he's around or who sees him."
Ms. Daigle further testified that around the third week in February she again told the defendant she wanted to end their relationship. He then drove her to a desolate field near the river where he pulled a gun on her. She testified as follows:
So after that, he pulled out the gun and he asked me again if I wanted him to go back to Chicago, and I told him yes, I didn't want to be with him anymore. And so he said okay. He said, "I want you to close your eyes. This is going to go real fast. You can go be with Taylor now." And he wanted to give me a hug and I pushed away. And that's whenever I just got on the ground and started begging him for my life.
Q. What did you do then?
*5 A. He just stood there with the gun pointed at my head while I was begging, telling him anything he wanted to hear. I'd marry him, have more kids, you know, meet his every need to stay alive. And so this went onit seemed like for a good hour of just begging and pleading for my life.
And then he finally told me to stand up. And I really did my best of convincing him that I wasn't going to say anything about what had gone on with my mom's house, that everything was going to be okay, we were going to fix it. And so he told me if I turned around and walked back to the car without turning around and looking at him, then that would mean that he could trust me and that I trusted him.
Ms. Daigle testified as she walked back to the vehicle, the defendant "shot bullets all around" her. Then, the couple returned home.
Around February 21 or 22, about a week and a half after meeting Ms. Willis at the restaurant, Ms. Daigle called Ms. Willis and invited her to stay with her and the defendant. Ms. Willis stayed for four or five days. She left but returned a few days later at Ms. Daigle's request. Ms. Daigle testified while Ms. Willis was at the house the defendant pulled a gun and threatened to kill them. She explained they were in the yard and he was swinging the gun everywhere and shooting it.
Ms. Daigle testified that around February 28 or 29, the defendant allowed her and Ms. Willis to leave the home to go to the store. Ms. Daigle went to her aunt's office, called the police, and never returned to the rental home. She went to a woman's battered shelter in Lafayette.
Ms. Daigle admitted that a neighbor, Shawn LeJeune, lived about one-hundred feet away from the rental home. She acknowledged Mr. LeJeune came over to their home near the end of February. On cross-examination, when asked why she never went over to the neighbor's home during this time, Ms. Daigle responded:
A. Well, because I wanted to do this the right way. I wanted to have all the proof. I wanted a witness, somebody that could stand by me and it not just be my word against his because too many people get away with this. So I wanted to make sure that I did everything right.
Ms. Willis testified Ms. Daigle told her she was afraid of the defendant, they had many arguments and she wanted to get away from him. When asked why she and Ms. Daigle did not leave sooner, the following pertinent exchange occurred:
Q. During that time, why didn't you and Farrah leave?
A. When?
Q. During the day. Particularly, if Bill was at work and you were there with Farrah, you all didn't leave?
A. No.
Q. But you had a car?
A. We didn't know what to do. I mean, I was just finding out more and more what was going on, just a little bit more and more each and every day. And she was scared to leave. She was scared. That's why she didn't want to leave at first because she thought something was going to happen to her.
Q. But there were times, though, when you and Farrah were at home and Bill was not at home, correct?
A. Uh-huh (affirmative response).
Q. And y'all didn't leave. Did you ever ask her to leave?
A. It was just onceno, I didn't know to leave. I mean, it was like oncehe went to work one time during the day for a while. And the second time he went to work, he just went for a little *6 while. And that was it. All the other times, we were all together.
Ms. Willis denied that the defendant ever forced her to stay at the rental home. She stated "[n]o, he never held me at gunpoint or anything like that. He didn't say, `You can't leave.'" Ms. Willis testified the defendant did not want Ms. Daigle to leave, but admitted he left Ms. Daigle alone at times and with her at times. Additionally, Ms. Willis recalled Mr. LeJeune came over to the rental home four times while she was there.
Ms. Willis testified the couple had a white phone they had borrowed from the neighbors because the defendant had broken their phone. She recalled the defendant taking the phone with him one time. Ms. Willis testified that sometime after she had left the first time, Ms. Daigle called her from the rental home and the defendant was not there. According to Ms. Willis, when she arrived at the rental home a half hour later, Ms. Daigle was crying and talking to her grandmother on the phone. The Defendant had not returned; Ms. Willis said she believed he had gone to the store or "something like that."
James Mitchell, Chief Financial Officer for Trussco, a company located in Abbeville, Louisiana, testified a safety class for new employees was held on February 21, 22, and 23, 2000. He stated new employees signed in when they arrived at the training. Several documents from this class were introduced into evidence without objection. The first document, a "PEC Class Transmittal Sheet" indicated a class date of February 21 to 23, 2000. The defendant's signature and social security number were listed on this sheet. A second document entitled "Medic First Aid Family of Programs" class roster dated February 22, 2000, reflected the defendant's signature. Mr. Mitchell testified this class lasted an eight-hour day. A Certificate of Recognition to Mr. Taves for attending this course was introduced into evidence. Additionally, the defendant introduced a third document entitled "Core Compliance Test Answer Sheet." Mr. Mitchell testified a core compliance testing answer sheet must be completed by all attendees at the end of the session to ensure the attendees learned everything. Mr. Mitchell explained this test sheet was taken from Mr. Taves' file. Additionally, the defendant received a "Certificate of Completion" certifying he had completed Trussco's "Hazwoper 40-hr Initial Course of Instruction." An equipment receipt dated February 22, 2000, indicating the defendant was issued certain equipment for his employment, was also introduced into evidence. Additionally, a document signed by the defendant dated February 22, 2000, indicated he had read the "Newpark Environmental Management, LLC Safety Rules Booklet." Also, labor tickets dated February 21, 22, and 23, 2000, were introduced into evidence. These tickets indicated the defendant completed eight hours in training class on both February 21 and 22, 2000, and five hours in training class on February 23, 2000. Further, a completion of training card was issued to the defendant. Mr. Mitchell testified an employee would not receive this card if he stayed in training for only an hour. On cross-examination, Mr. Mitchell admitted he did not know personally whether or not the defendant attended the classes.
Kenneth Taves, the defendant's father, testified that between February 7 and February 28, he spoke with the defendant and Ms. Daigle numerous times; specifically, two times on February 12, three times on February 20 and two times on February 28. However, Ms. Daigle testified she spoke with Mr. Taves only once during this time. Additionally, Mr. Taves testified he received a gift basket from Ms.
*7 Daigle during this time and on February 21, 2000, he wired $125.00 via Western Union to Ms. Daigle. Mr. Taves testified his son had a .32 pistol and Ms. Daigle owned a .357 Magnum.

FALSE IMPRISONMENT
In order to prove false imprisonment while armed with a dangerous weapon the State had to prove the defendant unlawfully and intentionally confined or detained the victim while armed with a dangerous weapon. La.R.S. 14:46.1.
In State v. Guillory, 461 So.2d 492 (La. App. 3 Cir.1984), the defendant appealed challenging the sufficiency of the evidence on his convictions of theft and false imprisonment while armed with a dangerous weapon. Deputy John Patrick Arceneaux, an undercover narcotics agent for the Calcasieu Parish Sheriff's Office, arrived at the defendant's home to attempt to purchase drugs. The defendant and Gerald Comeaux accused the deputy of being an undercover narcotics agent which the deputy denied. When the defendant left the room briefly, the deputy ran out of the house and Mr. Comeaux tackled the deputy in the front yard. The defendant came out of the house, removed the deputy's gun and all three men entered the house. The deputy testified the defendant forced him inside at gunpoint. Shortly thereafter, others arrived at the defendant's home and began to beat him. The defendant stopped the beating and allowed the deputy to leave, but kept the gun. This court found:
Accepting the facts in the light most favorable to the prosecution, the jury would find this defendant guilty of theft and false imprisonment, offender armed with a dangerous weapon, beyond a reasonable doubt. The conviction is based on the direct testimony of Deputy Arceneaux, and other evidence. Other witnesses contradicted Arceneaux. However, when there is conflicting testimony as to a factual matter such as this, the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence. State v. Klar, 400 So.2d 610 (La.1981). The jury's decision to believe Deputy Arceneaux was not clearly contrary to the evidence.
In the present case, the State asserted the false imprisonment occurred between February 7 and February 28. Ms. Daigle testified the day the defendant informed her of the incident at her mother's home (which, according to the State, was February 7, 2000), he pulled a gun on her, threatened to kill her, denied her access to a phone and refused to allow her to leave. Although Ms. Daigle's testimony regarding other occurrences during February 2000 were contradicted and/or inconsistent at times with that of other witnesses, Ms. Daigle's testimony regarding the February 7 incident was neither disputed nor contradicted. Viewing the evidence in the light most favorable to the prosecution, we conclude the State presented sufficient evidence to convict the defendant of false imprisonment while armed with a dangerous weapon.

SECOND DEGREE KIDNAPPING
The elements of second degree kidnapping, provided for in La.R.S. 14:44.1, state in pertinent part:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;

*8 (3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
In State v. Steward, 95-1693, p. 10 (La. App. 1 Cir. 9/27/96); 681 So.2d 1007, 1013, the court explained:
The provisions of this statute apply when any one occurrence mentioned in Subsection (B) combines with any one occurrence enumerated in Subsection (A). The statute does not require that the distance traveled during the forcible seizure be any particular length. State v. Arbuthnot, 625 So.2d 1377, 1383-1384 (La.App. 1st Cir.1993).
The testimony of Ms. Daigle indicated that around the third week of February she informed the defendant again she wanted to end their relationship. The defendant, while armed with a gun, forced her to get in a vehicle because he wanted to go and talk by the river.
The defendant contends the victim did not testify that he made her get in the car against her will or with a threat of violence. However, Ms. Daigle testified she did not want to go but she went because she believed the defendant was going to kill her and she indicated the defendant was armed with a gun at that time.
After Ms. Daigle entered the car, the defendant drove to a field by the river, parked the vehicle and told her to get out. After walking about twenty feet past the car, the victim testified she stopped and she told the defendant she was not going any further. The defendant pulled out a gun and threatened to kill her. Ms. Daigle begged for her life. Following, the defendant told Ms. Daigle to return to the vehicle. As she turned to return to the vehicle, the defendant shot the gun several times. Following, he returned Ms. Daigle to the rental home.
Although Ms. Daigle's testimony regarding other occurrences during February 2000 were contradicted and/or inconsistent at times with other witnesses, Ms. Daigle's testimony regarding the incident by the river was neither disputed nor contradicted. Again, viewing the evidence in the light most favorable to the prosecution, we conclude the State presented sufficient evidence to convict the defendant of second degree kidnapping.

DENIAL OF MOTION FOR A NEW TRIAL
The defendant contends he is entitled to a new trial based upon the newly discovered evidence of Lofton Staffing employment records and the testimony of Joyce LeJeune, Tiffany LeJeune and Shawn LeJeune. The trial court denied the motion. It found the defendant failed to prove these witnesses could not have been discovered by "reasonable diligence."
La.Code Crim.P. art. 851 provides:
The motion for a new trial is based on the supposition that injustice has been done to the defendant, and, unless such is shown to have been the case the *9 motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
In State v. Laird, XXXX-XXXX, p. 8 (La.App. 3 Cir. 11/21/01); 800 So.2d 427, 433, this court explained:
The standard of review applicable to a motion for new trial based on newly discovered evidence has been set forth as follows:
A defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that the new evidence was discovered after trial; (2) that failure to discover the evidence before trial was not attributable to his lack of diligence; (3) that the evidence is material to the issues at the trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the event of retrial. State v. Hammons, 597 So.2d 990, 994 (La.1992); State v. Knapper, 555 So.2d 1335, 1339 (La. 1990); State v. Prudholm, 446 So.2d 729, 735 (La.1984). In ruling on the motion, "[t]he trial judge's duty is not to weigh the evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment." Prudholm, 446 So.2d at 736.

State v. Cavalier, 96-3052, 97-0103, p. 3 (La.10/31/97), 701 So.2d 949, 951.
In State v. Guidry, 94-678, p. 9 (La.App. 3 Cir. 12/7/94); 647 So.2d 502, 508, this court stated: "[t]he trial court's application of these precepts to newly discovered evidence is entitled to great weight, and its denial of a new trial will not be disturbed on appeal absent a clear abuse of that discretion. State v. Clayton, 427 So.2d 827 (La.1982)."
The defendant was aware that he had worked for Loftin Staffing prior to trial; thus, these records are not newly discovered evidence. Additionally, the defendant failed to show that the exercise of reasonable diligence by him or his attorney would not have uncovered the witnesses, Joyce LeJeune and Tiffany LeJeune, before or during trial. At trial, the defense attorney brought out how neighbors lived one-hundred feet away from the rental home. The defense attorney asked Ms. Daigle who lived in the home. Ms. Daigle responded "I know one of the persons' name. I don't know the whole family's name." Ms. Willis testified Mr. LeJeune, his sisters and his mom were neighbors of the defendant and Ms. Daigle.
Consequently, the defendant failed to prove the Lofton Staffing records, and the *10 testimony of Joyce and Tiffany LeJeune were newly discovered evidence warranting a new trial.
Shawn LeJeune stated in an affidavit that he was a neighbor of the defendant and Ms. Daigle during the month of February 2000 and did not observe the defendant threaten Ms. Daigle or inhibit her actions. Based upon Mr. LeJeune's affidavit, the defendant has failed to show Mr. LeJeune's testimony was material. The evidence introduced at trial covered a three-week period. The evidence presented by the State to support a conviction of false imprisonment indicated the incident occurred on February 7. Additionally, the evidence presented by the State to support a conviction of second degree kidnapping indicated the incident occurred one day, during the third week of February, when the defendant forced the victim to go to the river. There is nothing in the affidavit to indicate Mr. LeJeune had personal knowledge or was present during these two incidents.
Consequently, the trial court did not abuse its discretion in denying the defendant's motion for new trial on this basis.

INEFFECTIVE ASSISTANCE OF COUNSEL
The defendant asserts his trial counsel was ineffective for failing to discover, interview and call for trial Joyce LeJeune, Tiffany LeJeune and Shawn LeJeune.
This court in State v. Holley, XXXX-XXXX, p. 13 (La.App. 3 Cir. 10/3/01); 799 So.2d 578, 587, quoting State v. Bright, 98-0398, pp. 40-41 (La.4/11/00); 776 So.2d 1134, 1157, explained:
A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. E.g., State v. Prudholm, 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. E.g., State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.
In this case, the defendant's claim regarding the ineffectiveness of his trial counsel involves the defense counsel's trial strategy and the record does not permit a definite resolution of this issue. Consequently, this court could find this claim is more appropriate for post-conviction relief.

EXCESSIVENESS OF SENTENCE
The defendant contends his sentences are constitutionally excessive.
In State v. Phillips, XXXX-XXXX, pp. 3-4 (La.App. 3 Cir. 1/16/02); 809 So.2d 467, 469-470, this court explained:
The Louisiana Constitution, Article 1, Section 20 prohibits "cruel, excessive, or unusual punishment." To find that this sentence is excessive, we must conclude that the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals; therefore, it is nothing more than a needless imposition of pain and suffering. State v. Schmidt, 99-1412 (La.App. 3 Cir. 7/26/00); 771 So.2d 131, 157. Further, the trial court is given wide discretion in imposing a sentence, and a sentence that is imposed within the statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. Id.

We have previously held that factors such as the particular circumstances surrounding the commission of the crime, the offender's personal history, prior criminal record, and the likelihood of recidivism or rehabilitation should be *11 considered. After reviewing such illustrative factors, the court may conclude that the sentence imposed constitutes a clear abuse of the sentencing judge's discretion. State v. Young, 532 So.2d 301 (La.App. 3 Cir.1988).
At the sentencing proceeding, the defendant's father, Mr. Taves, acknowledged that if the defendant was released to a home incarceration program or some other release program, he would help the defendant financially. Additionally, Mr. Taves testified that upon release, the defendant would live with the defendant's new girlfriend. The thirty-one-year-old defendant testified that if he were released he had employment with Lagneaux's Seafood Restaurant. Additionally, the defendant declared he was innocent of the crimes.[1]

FALSE IMPRISONMENT
Defendant was sentenced to ten years at hard labor, the maximum sentence, with this sentence to run concurrently to the sentence imposed on the second degree kidnapping charge. See La.R.S. 14:46.1.
In State v. Jones, 99-1074, p. 3 (La.App. 3 Cir. 3/8/00); 758 So.2d 905, 907, writ denied, XXXX-XXXX (La.8/31/01); 795 So.2d 1202, this court held that "... maximum sentences are reserved for the most egregious offenders." (Citation omitted).
Although the actions of the defendant were unjustified, applying the facts of this case and considering the material contained in the pre-sentence investigation report, we find the ten-year sentence on the charge of false imprisonment makes no measurable contribution to the acceptable penal goals and is grossly disproportionate to the severity of the crime as to shock one's sense of justice. Therefore, we set aside this sentence and remand for resentencing.

SECOND DEGREE KIDNAPPING
La.R.S. 14:44.1 provides a term of imprisonment between five and forty years and the defendant was sentenced to twenty-five years, a midrange sentence.
In State v. Reese, 34,275 (La.App. 2 Cir. 12/20/00); 774 So.2d 1164, the defendant was convicted of second degree kidnapping and sentenced to ten years at hard labor. The defendant arrived at his ex-wife's home, with his 15-month-old baby, and entered uninvited. The ex-wife's boyfriend hit the defendant from behind on the shoulder with a three-foot hammer handle. Seeing the baby in the defendant's arms, the boyfriend retreated. However, the defendant became angry, placed the baby on the floor, grabbed his ex-wife behind the neck and forced her into the bathroom at gunpoint. The defendant told the boyfriend to leave, threatening to kill his ex-wife if he did not comply. During this time, the defendant's twin daughters came running out of their bedroom *12 and the defendant captured one of them by her hair dragging her into the bathroom. She eventually escaped. The defendant threatened to kill himself. The police SWAT team was called, and after a standoff, the defendant surrendered. No one sustained injuries.
Again, although the actions of the defendant were unjustified, applying the facts of this case and considering the material contained in the pre-sentence investigation report, we find the twenty-five-year sentence on the charge of second degree kidnapping makes no measurable contribution to the acceptable penal goals and is grossly disproportionate to the severity of the crime as to shock one's sense of justice. Therefore, we set aside this sentence and remand for resentencing.

ERRORS PATENT
We recognize one error patent.
The defendant was sentenced immediately after the trial court's denial of his motion for a new trial. La.Code Crim.P. art. 873 mandates a twenty-four-hour delay between the denial of such motions and the imposition of sentence. The first issue to be resolved is whether counsel's actions at the hearing acted as a waiver of the delay set by Article 873. At the beginning of the hearing on the motion for new trial, defense counsel informed the court, "I believe we have Mr. Taves' motion for new trial, Your Honor, and a sentencing scheduled at the same time." Thus, defense counsel was aware at the beginning of the hearing that the sentencing was scheduled to take place the same day the motion for new trial would be heard and he failed to voice an objection. After the trial court denied the motion for new trial and told the defendant to come up for sentencing, defense counsel stated, "Your Honor, we have evidence for the sentencing. I'd like to put Mr. Taves' father on and William Taves, if possible, for a brief statement." After the defendant's father testified and the defendant was allowed to give a statement to the court, defense counsel argued for the trial court to impose a suspended sentence upon the defendant. Defense counsel indicated that he had reviewed the Pre-sentence Investigation Report and discussed it with the defendant.[2] The defendant did not object to the trial court proceeding to sentencing immediately after the denial of the motion for new trial. Defense counsel does not assign the trial court's failure to delay sentencing as error nor does he allege prejudice. Appellate counsel simply states that the trial court sentenced the defendant without a determination as to whether the defendant wished to waive his delays for sentencing.
Based on the above, we conclude the defense waived the delay period and has not shown he was prejudiced. State v. Williams, 01-998 (La.App. 3 Cir. 2/6/02); 815 So.2d 908.

CONCLUSION
Based on the foregoing, the defendant's convictions are affirmed. However, the defendant's sentences are constitutionally excessive. Therefore, the defendant's sentences are vacated and this case is remanded for resentencing.
CONVICTIONS AFFIRMED. SENTENCES VACATED AND CASE REMANDED FOR RESENTENCING.
COOKS, J., Dissents in Part and Assigns Written Reasons.
*13 COOKS, J., dissents in part.
I would affirm defendant's convictions and sentences. Neither the constitution of this state nor the United States requires that we allow a defendant to comparison shop or seek competitive bids during the sentencing phase of a criminal proceeding. The sentences imposed in this case for the conduct of this defendant are not so egregious as to shock my sense of justice. Equity and justice are not synonymous.
NOTES
[1] The pre-sentence investigation report indicated that in 1995 the defendant was convicted of three misdemeanors. While serving time, he escaped and entered a plea of no contest to the charge of escape after an unlawful misdemeanor. In March of 2000, the defendant was convicted of aggravated criminal damage to property. The report classified the defendant as a first offender. The report listed numerous charges which did not contain a disposition or stated the charge had been dismissed. Additionally, the report indicated the defendant admitted use of marijuana and alcohol off and on since age fifteen. The defendant dropped out of high school in the 11th grade. He worked for his father as a computer programmer from 1993 to 1995 and between 1999 to 2000, he worked as a welder. The defendant had been married and had two children by the marriage. Additionally, in the pre-sentence investigation report, the victim stated that as a result of the offenses, she had to undergo mental health treatment, she broke her foot and she suffered a hearing loss.
[2] The defendant claimed he had not seen the P.S.I., but defense counsel stated that although he did not let the defendant read it in detail, he had discussed it with him.