# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 24-79


**STATE OF LOUISIANA**

**VERSUS**

**KINERIC O'NEAL CURRY**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 23-1
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**WILBUR L. STILES**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Charles G. Fitzgerald, and Wilbur L. Stiles, Judges.


**AFFIRMED WITH INSTRUCTIONS.**

**Paula C. Marx**
**Louisiana Appellate Project**
**P.O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kineric O'Neal Curry**

**J. Reed Walters**
**District Attorney**
**Twenty-Eight Judicial District**
**W. Evans Dorroh, III**
**Assistant District Attorney**
**P. O. Box 1940**
**Jena, LA 71342-1940**
**(318) 992-8282**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**STILES, Judge.**

A unanimous jury found Defendant, Kineric O'Neal Curry, guilty on October 23, 2023 of false imprisonment with a dangerous weapon, domestic abuse aggravated assault, and domestic abuse battery. On December 5, 2023, the trial court sentenced Defendant to serve nine years at hard labor for false imprisonment with a dangerous weapon, four years at hard labor for domestic abuse aggravated assault, and six months in the parish jail for domestic abuse battery.

Defendant has appealed, arguing that the evidence admitted at trial was insufficient to support the guilty verdict of false imprisonment while armed with a dangerous weapon. For the following reasons, we affirm Defendant's conviction and sentence, with instructions.

## FACTS AND PROCEDURAL HISTORY

Defendant and the victim, Ruth Ann Crafts, lived together as boyfriend and girlfriend. It is undisputed that on August 30, 2022, there was an argument between the two at their home. Ms. Crafts testified at trial that as she was getting ready for work, Defendant backhanded her into the bathtub and she fell over a shelf. He then told her to shut her mouth and that she was not going to work. According to Ms. Crafts' testimony, Defendant initially had a bat which he used to beat the bedroom walls. They then went "into the living room and he grab[bed] this big old piece of wood and he start[ed] screaming and hollering and [] cussing and he beat the piece of wood upside beside [Ms. Crafts'] head." Defendant next got a knife and threatened to kill Ms. Crafts, straddling her on the couch while holding the knife in his hand.

During this altercation, Ms. Crafts' friend and coworker, Robbie Charlene Thomas, arrived to pick up Ms. Crafts for work. Both Ms. Thomas and Ms. Crafts

testified at trial that when Ms. Thomas knocked on the door, Defendant poked his head out and informed Ms. Thomas that Ms. Crafts was not going to work that day. Ms. Crafts was behind Defendant and asked Ms. Thomas to call 911. When Ms. Thomas told Defendant she was going to call the police, they got into an argument. While Defendant was distracted, Ms. Crafts ran out the door and got into Ms. Thomas' car. Ms. Thomas then drove Ms. Crafts to her house, where they called Ms. Crafts' mental health counselor, Glenda Parker. When Ms. Parker arrived at Ms. Thomas' house, she called the police.

Defendant was initially charged in a bill of information with false imprisonment with a dangerous weapon, in violation of La.R.S. 14:46.1, domestic abuse aggravated assault, in violation of La.R.S. 14:37.7, and domestic abuse battery by strangulation, in violation of La.R.S. 14:35.3(A), (B)(7), and (L).[1] A jury trial commenced on October 23, 2023, and on October 24, 2023, a unanimous jury found Defendant guilty of false imprisonment with a dangerous weapon, domestic battery aggravated assault, and the responsive verdict domestic abuse battery.

On December 5, 2023, the trial court sentenced Defendant to serve nine years at hard labor for false imprisonment with a dangerous weapon, four years at hard labor for domestic abuse aggravated assault, and six months in the parish jail for domestic abuse battery. The trial court ordered that the sentences for domestic abuse aggravated assault and domestic abuse battery are to be served concurrently with one another, but consecutively with the sentence for false imprisonment with a dangerous weapon. Defendant was ordered to pay all costs of court, including the

---

[1] The bill of information was amended on October 23, 2023, to reflect Defendant's correct name and social security number.

cost of the presentence investigation report, and to stay away from the victim, Ms. Crafts, for two years.

Defendant has appealed, asserting one assignment of error:

The evidence is insufficient to support the guilty verdict of false imprisonment while armed with a dangerous weapon.

Specifically, Defendant argues that the evidence admitted at the trial of this case was insufficient to prove beyond a reasonable doubt that Defendant, while armed with a dangerous weapon, intentionally confined or detained Ms. Crafts, in violation of La.R.S. 14:46.1.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we have found an error in the Uniform Commitment Order which requires correction.

The transcript of Defendant's sentencing hearing states that the trial court ordered the sentence imposed for domestic abuse battery to run concurrently with the sentence imposed for domestic abuse aggravated assault, but to run consecutively with the sentence imposed for false imprisonment with a dangerous weapon. However, the Uniform Commitment Order states that the sentence imposed in Count 3 (domestic abuse battery) was ordered to run concurrently with both Count 1 (false imprisonment with a dangerous weapon) and Count 2 (domestic abuse aggravated assault). In the event of such a conflict, the sentencing transcript prevails. *State v. Williams*, 15-498 (La.App. 3 Cir. 12/9/15), 181 So.3d 857, *writ denied*, 16-26 (La. 1/13/17), 215 So.3d 242.

Accordingly, we instruct the trial court to correct the Uniform Commitment Order to correctly reflect the trial court's order that the sentence imposed for

domestic abuse battery is to run consecutively to the sentence imposed for false imprisonment with a dangerous weapon.

## ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant contends that the evidence admitted at trial was insufficient to support the verdict of false imprisonment while armed with a dangerous weapon.

The analysis for an insufficient-evidence claim is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. v. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied*, 15-1151 (La. 5/13/16), 191 So.3d 1054.

Louisiana Revised Statutes 14:46.1 defines false imprisonment with a dangerous weapon as "the unlawful intentional confinement or detention of another while the offender is armed with a dangerous weapon." "In order for this court to uphold a conviction of false imprisonment while armed with a dangerous weapon,

4

La.R.S. 14:46.1 requires the State prove that the Defendant unlawfully and intentionally confined or detained the victim while armed with a dangerous weapon." *State v. Disedare*, 19-810, p. 20 (La.App. 3 Cir. 5/13/20), 298 So.3d 342, 357, *writ denied*, 20-800 (La. 12/22/20), 307 So.3d 1041 (quoting *State v. Touchet*, 04-1027, p. 11 (La.App. 3 Cir. 3/9/05), 897 So.2d 900, 908).

*Defendant's Argument*

Defendant contends that the evidence admitted at trial, when viewed under the *Jackson v. Virginia* standard, was insufficient to prove beyond a reasonable doubt that he, while armed with a dangerous weapon, intentionally confined or detained the victim, Ms. Crafts. He urges that although Ms. Crafts may have felt that he would not let her leave their home, the evidence adduced at trial did not establish that she attempted to leave the home and was prevented from doing so by Defendant. According to Defendant, Ms. Crafts' friend, Ms. Thomas, testified that "the door was open" and that Defendant "did not have a weapon at that time." Defendant further notes that he "did not try to stop" Ms. Crafts once she ran outside and "did not chase her when she left" their home.

To support his argument, Defendant differentiates the facts of his case with those of *State v. Shupp*, 15-695 (La.App. 3 Cir. 2/3/16), 185 So.3d 900, wherein the defendant zip-tied the victim's hands and held her captive in the bathroom. Defendant asserts that the circumstances of his case did not involve a "hostage type situation" like in *Shupp*, but was rather "an altercation with injuries sustained by Ms. Crafts." Defendant notes that no dangerous weapon was introduced into evidence, no testimony revealed that he was holding a weapon when Ms. Thomas arrived, and no testimony established that Ms. Crafts was tied up or bound to prevent her from leaving. As such, Defendant concludes that the State failed to prove that he was

5

guilty of false imprisonment while armed with a dangerous weapon beyond a reasonable doubt and prays that his conviction for this offense be vacated.

*State's Argument*

On the contrary, the State argues that the evidence admitted at trial was sufficient for any rational trier of fact to find Defendant guilty of false imprisonment with a dangerous weapon. In support of its argument, the State cites *State v. Taves*, 02-709, p. 9 (La.App. 3 Cir. 1/15/03), 846 So.2d 1, 7, *reversed on other grounds*, 03-518 (La. 12/3/03), 861 So.2d 144, wherein this court affirmed the defendant's conviction for false imprisonment while armed with a dangerous weapon after the defendant "pulled a gun on [the victim], threatened to kill her, denied her access to a phone and refused to allow her to leave." The State additionally cites *State v. Disedare*, 298 So.3d at 357-58, wherein this court affirmed the defendant's conviction for false imprisonment with a dangerous weapon when the victim testified that the defendant "dispossessed her of her cell phone and keys and threw them in the yard before attacking her" and put a knife "to her neck and chest and threatened to cut her heart out."

The State argues that the facts of *Taves* and *Disedare* are similar to those of this case, as Ms. Crafts testified that Defendant told her she was not going to work, strangled her while holding a knife in his hand, and took her wallet and her phone. Moreover, the State rationalizes that the jury, as factfinders, believed Ms. Crafts' statement regarding the events that occurred. As such, the State contends that the evidence admitted at trial was sufficient to prove beyond a reasonable doubt that Defendant committed false imprisonment with a dangerous weapon.

*Analysis of the Facts and Jurisprudence*

The evidence presented at the trial of this matter included the testimony of five witnesses: Robbie Charlene Thomas, Ms. Crafts' friend and co-worker; Clark Palmer, the owner of the mobile home being rented by Ms. Crafts at the time of the incident; Glenda Parker, Ms. Crafts' mental health counselor; Deputy Jordan Mayo, the officer who responded to the incident; and Ruth Crafts, the victim.

Ms. Thomas testified that on August 30, 2022, she went to Ms. Crafts' home to pick her up for work, which was something she did regularly every day. When Ms. Thomas knocked on the door, Defendant "poked his head out and told [her] that Ruth Ann was not going to work that day." Ms. Thomas stated that she started looking around and when she spotted Ms. Crafts behind Defendant in the residence, Ms. Crafts told her that she couldn't get out and asked her to call 911. When asked what her impressions were as to what was going on at the time, Ms. Thomas testified:

> I had no idea, really, when I initially walked up but whenever she told me to call 911 and I told him then, I said, is she going to come outside or not? And he said, she ain't going to work today. And then I said, well, I ain't got time to play games so I'm going to my truck and I'm getting my phone and I'm going to call the law.

When Ms. Thomas turned to go to her vehicle to get her phone, Ms. Crafts managed to get past Defendant and out onto the front porch. Ms. Crafts then got into Ms. Thomas' vehicle and the two of them left the residence. When they arrived at Ms. Thomas' home, they called Ms. Crafts' counselor, Ms. Parker, who arrived about five to ten minutes later.

Ms. Thomas was asked at trial to describe Ms. Crafts' demeanor at the time she was able to get out of the house. She testified that Ms. Crafts had fear in her eyes, that she had been crying, she was shaking, and she was hysterical. When pressed about Ms. Crafts' demeanor as she described the incident to Ms. Thomas, Ms.

Thomas stated that Ms. Crafts "was terrified" and "shaking like a leaf on a tree." Additionally, Ms. Thomas noticed a bruise on the left side of Ms. Crafts' chin and a mark and bruise under her ear along her jawline. On cross-examination, Ms. Thomas noted that those bruises were new as Ms. Crafts didn't have any marks on her the day before the incident. Ms. Thomas also stated that she had "no idea" if Defendant had tried to prevent Ms. Crafts from leaving the home due to her back being turned at the time. Nevertheless, Ms. Thomas testified that Defendant did not have a weapon and did not follow them once Ms. Crafts left the home. She explained that she did not call the police because Ms. Crafts was scared and loved Defendant.

The second witness to testify at trial was Mr. Palmer, Ms. Crafts' former landlord and the owner of the mobile home in which the incident occurred. Mr. Palmer was asked to describe the condition of the mobile home after the August 30, 2022 incident:

> Once I was able to finally get into the mobile home and look around, I was able to see that there were a number – fifteen, I didn't count them. A number of holes that had been poked into the ceiling. There were a number of places where the sheetrock had been bashed in. And the house was in a general state of disheveled [sic]. It was a mess.

He further testified that there were also holes in the floor. When asked if he thought someone had intentionally damaged the mobile home, Mr. Palmer stated, "Yes. I was told they had and then it was clear that these were not problems that had developed over time. Someone had to have done these things." Mr. Palmer ultimately demolished the mobile home due to its condition.

Ms. Parker, a mental health specialist and Ms. Crafts' former counselor, was the next witness called at trial. She testified that Ms. Thomas called her on the day of the incident and asked if she could come to Ms. Thomas' home because Ms. Crafts was hysterical. When Ms. Parker arrived, Ms. Crafts "was very, very upset.... She

was shaking. Just really frantic." Ms. Parker testified that Ms. Crafts told her the following about what occurred with Defendant at her home:

> She said that she had been at her home and that they had, had an altercation. That it had started in the bathroom. That, uh, in the bathroom she was trying to get ready for work and that [Defendant] had backhanded her. And then from that point they had moved into the living room and she just kept saying that he hit the wall with this big object, piece of wood or object, and that he had threatened her with a knife, to put it through her head. That he had choked her. And then she moved to, that Robbie had showed up to take her to work and she had, his attention was away from her and she ran out the door. And apparently fled with Robbie.

Ms. Parker further testified that Ms. Crafts "kept saying that . . . her neck and chin hurt" and that Ms. Crafts had "signs of a slight bruising." The officer who arrived at Ms. Thomas' home asked Ms. Parker to take photographs of Ms. Crafts' bruises, which she did.[2] Ms. Parker stated that she saw Ms. Crafts the next day for a follow-up and observed that "her neck was more bruised."

On cross-examination, Ms. Parker stated that she had never seen Ms. Crafts as frantic as on the day of the incident. According to Ms. Parker, Ms. Crafts expressed feeling trapped, "that she wasn't going to get out of there." Ms. Parker further admitted that in previous counseling sessions, Ms. Crafts "felt like, maybe, her safety was compromised."

Deputy Jordan Mayo of the LaSalle Parish Sheriff's Department testified at trial regarding his investigation of the case. Deputy Mayo stated that on the date of the incident, he was dispatched to an area in the Midway Community, where he spoke with Ms. Crafts and Ms. Parker. When asked to elaborate on Ms. Crafts' demeanor, Deputy Mayo stated:

---

[2] Photographs taken by Ms. Parker depicting Ms. Crafts' injuries were entered into evidence as State's Exhibits 1 and 2.

She was so upset that she could barely talk. And when I would get her to talk, which it took a little bit to get her to talk to us she was so upset. And at times we would have to take a break and she would have to collect herself because she would begin to hyperventilate and she would begin to cry really, really loud and she would become very, very upset. Very emotional. And so at times we would have to take a break, stop, let her collect herself, get her thoughts back together and continue on from there.

Deputy Mayo also noticed "red marks" and "bruising" around Ms. Crafts' neck and chin.

Deputy Mayo's bodycam footage of his interview with Ms. Crafts was played at trial.[3] We have also reviewed the bodycam footage. During her interview with Deputy Mayo, Ms. Crafts stated numerous times that Defendant threatened to kill her and had a "bat, stick, and a knife" throughout the incident. She also stated that Defendant went to get a "shoe box," which she believed had a firearm in it.

The final witness to testify at trial was Ms. Crafts. She testified that she and Defendant were dating and living together at the time of this incident. According to Ms. Crafts, things escalated on August 30 as she was getting ready for work.

Q.	Where did the unpleasantness start and why?

A.	In the bathroom. I was getting dressed for work. I was fixing to do my hair and we was having a conversation and [Defendant] backhanded me into the bathtub. I fell over a shelf.

Q.	Did he speak anything to you? Did he tell you anything?

A.	Not right then. He just told me to shut my mouth and I wasn't going to go to work. So, I go to the bedroom to change clothes because I always change clothes. He followed me in there. We went to the living room. He followed me there.

Q.	When you were in the bedroom, what happened?

A.	He had a bat and he started beating the walls.

---

[3] A thumb drive containing the video footage was entered into evidence as State's Exhibit 3.

Q. Okay. Did he not tell you, at that time, why he was angry?

A. He never said why he was angry except for that I had a man under the bed.

Q. Did you have a man under the bed?

A. No, sir. My mattress set [sic] on the floor.

Q. Okay. It didn't compute. So, after what happened in the bedroom happened, what happened after that?

A. We go into the living room and he grabs this big old piece of wood and he starts screaming and hollering and he's cussing and he beats the piece of wood upside beside my head.

Q. Where were you-

A. I was sitting on the couch.

Q. You were sitting on the couch?

A. Yes, sir.

Q. Okay. Where is he, relative to you and the couch?

A. He's in front of me.

Q. Okay.

A. My kitchen and my living room's together. It's one big room.

Q. Okay.

A. All right. He hits the big old stick up against, right beside my head on the couch. Then he says he's going to get a knife and he's going to put a knife through my skull and I won't be alive in the morning.

Q. Did he get a knife? Ruth Ann, I know this is hard but it's better to do it right now than to have to come back and do it later. Okay?

A. He said I won't be alive by morning.

Q. Did he have anything in his hand whenever he told you that?

A. He had a knife in his hand.

Q. Where was he, relative to you, whenever he told you that?

A.      He was straddle [sic] me on the couch.

Q.      Did you believe him?

A.      Yes, sir.

Q.      When he swung the bat – how many times did he swing the bat towards you?

A.      I'm not sure.

Q.      More than how many?

A.      I don't know. It was a lot. He was on a rampage.

Q.      Ruth Ann, three witnesses have testified that you had marks on your neck. How did you get marks on your neck?

A.      From where he tried to choke me.

Q.      Describe to the jury how you felt when he tried to choke you.

A.      I thought I was going to die.

Q.      Do you recall Robbie Thomas getting to your house to pick you up for work?

A.      Yes, sir.

Q.      You and [Defendant], both, were aware that she was at the house before she actually knocked on the door?

A.      Yes, sir. We heard her pull into the driveway.

Q.      What, if anything, did [Defendant] tell you whenever she pulled into the driveway?

A.      He told me not to speak and that I couldn't go to work. And she knocked on the door and he told her I wasn't going to work that she could leave. And she looked in and I was on the couch and I mouthed to her to call 911.

Q.      So, what, did she and [Defendant] exchange words after that?

A.      Yes, sir.

Q.      Who said what to [who]? Describe the conversation.

A.    She said she wasn't leaving there until she laid eyes on me and she talked to me. And he said she wasn't talking and she wasn't going to talk to me, and she needed to leave. And they got into a screaming match. My door has only a deadbolt. I didn't have a regular doorknob. And the door come open and his back was turned to me and I run out the house.

Q.    When you ran out of the house, where did you go?

A.    To [Ms. Thomas'] and she called my counselor and then they called the law.

Q.    Was there any – I'm going to back you up a little bit. Okay, Ruth Ann? Was there any discussion, on that day, about a gun in your trailer?

A.    Yes, sir. He said everybody thinks he don't have a gun but he has a gun and he's going to fucking prove it.

Q.    How close to that was from whenever, when Robbie Thomas came to your house?

A.    Just a few minutes before. And he gets up off of me and goes down the hallway and he grabs a shoe box.

Q.    You never saw what was in the shoe box, did you?

A.    No, sir.

On cross-examination, Ms. Crafts testified that Defendant confiscated her wallet and phone and had three weapons in his possession throughout the incident: a bat, a piece of wood, and a knife. According to Ms. Crafts, Defendant's back was turned towards her when she took the opportunity to run; thus, Ms. Crafts could not definitively state whether Defendant reached for her to stop her from running out of the door.

After viewing the evidence in a light most favorable to the prosecution, we find that the evidence presented at trial proved beyond a reasonable doubt that Defendant committed the offense of false imprisonment with a dangerous weapon. As noted by the State, Ms. Crafts, the victim, testified that Defendant told her that she was not going to work, took her phone and wallet, and possessed various

13

weapons throughout the incident. Although no weapons were recovered or seen by anyone other than Ms. Crafts, we note "[i]t is not the province of the reviewing court to assess the credibility of witnesses or reweigh evidence." *State v. Crawford*, 14-2153, p. 20 (La. 11/16/16), 218 So.3d 13, 26 (citing *State v. Smith*, 94-3116, p. 2 (La. 10/16/16), 661 So.2d 442, 443). Therefore, we find that the State presented sufficient evidence to prove that Defendant intentionally confined or detained Ms. Crafts with a dangerous weapon.

Accordingly, Defendant's assignment of error lacks merit.

### DECREE

For the foregoing reasons, Defendant's convictions and sentences are affirmed. The trial court is instructed, however, to correct the Uniform Commitment Order to correctly reflect the trial court's order that the sentence imposed for count three, domestic abuse battery, is to run consecutively to the sentence imposed for count one, false imprisonment with a dangerous weapon.

**AFFIRMED WITH INSTRUCTIONS.**